J. W. JONES v. CHICAGO, BURLINGTON & QUINCY RAILROAD COMPANY, a Corporation, Appellant.—125 S. W. (2d) 5.

Division Two, February 21, 1939.

*J. A. Lydick* and *Sullivan, Reeder & Finley* for appelant; *J. C. James* of counsel.

*Rendlen, White & Rendlen, B. F. Jones* and *Luther & Luther* for respondent.

1110

COOLEY, C.—The appeal in this case was first lodged in the St. Louis Court of Appeals, the amount of the judgment being within the appellate jurisdiction of that court. Two opinions were there written. The first, by BENNICK, C., affirmed the judgment of the circuit court. On rehearing that opinion was withdrawn and an opinion written reversing said judgment. On motion for rehearing, BECKER, J., withdrew his concurrence and dissented, deeming the decision in conflict with Tranbarger v. Chicago & Alton Railroad Co., 250 Mo. 46, 156 S. W. 694, and upon his request the case was certified to this court. The second opinion of the Court of Appeals is reported in 100 S. W. (2d) 617. After careful examination of the voluminous record we think the statement of facts in the first opinion of the Court of Appeals and the conclusions of law therein set forth are substantially correct and we borrow largely therefrom in disposing of the case here.

The action is in three counts, by which plaintiff, J. W. Jones, a crop-sharing tenant farmer upon certain lands located in Clark County, Missouri, seeks to recover from the defendant, Chicago, Burlington & Quincy Railroad Company, for the damage done to his growing

crops by overflows alleged to have resulted from the negligent and wrongful failure of defendant to maintain suitable and adequate openings and outlets across and through its right of way so as to permit the drainage and escape into the Mississippi River of the high water carried in the streams which flow into and through the general territory in which plaintiff's farming operations were conducted.

There is some dispute in the case as to whether the action was founded merely upon certain specific acts of negligence charged in the petition, or upon the theory of a violation by defendant of the provisions of Section 4765, Revised Statutes 1929 (Mo. Stat. Ann., sec. 4765, p. 2158), which makes it the duty of every company owning or operating a railroad in this State to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such railroad so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad, whenever the draining of such water has been obstructed or rendered necessary by the construction of the railroad. Defendant contends for the former theory of the case, and plaintiff for the latter.

The case was taken on change of venue from the Circuit Court of Clark County to the Circuit Court of Scotland County, wherein, upon a trial to a jury extending over a period of more than three weeks, a verdict of ten jurors was returned in favor of plaintiff, and against defendant, in the aggregate sum of $1703. Judgment was rendered accordingly and defendant appealed.

The lands farmed by plaintiff and upon which his losses occurred are located within the limits of what is known as the Mississippi and Fox River Drainage District No. 1 in Clark County, near the northeast corner of the State. Though organized in 1916, the district has never functioned as a drainage district, and no improvements or reclamation works have ever been constructed within it.

The district, which roughly includes from 12,000 to 13,000 acres, is bounded on the north by the Des Moines and Mississippi Levee District, an organized levee district containing about 11,000 acres and some sixty miles of drainage ditches; on the south by the Gregory Drainage District, an improved and functioning drainage district; on the east by the tracks and right of way of defendant, Chicago, Burlington & Quincy Railroad Company, whose tracks run parallel with and either upon or else quite close to the western bank of the Mississippi River; and on the west by U. S. Highway No. 61, a paved thoroughfare running generally north and south, and constituting one of the familiar units in our local improved highway system. The district comprises an approximate area of twenty square miles, and has its northeast corner just south of the town of Alexandria, and its southeast corner just north of the town of Gregory, both in Clark County, and located upon defendant's line a distance of some six miles apart.

The lands within the district are level, bottom lands, without any considerable variation in elevation, though sloping slightly so as eventually to drain towards the east to the Mississippi River which is the natural outlet for all waters and watercourses coming into or passing through the district.

Of the streams flowing into the district the largest is Fox River, some seventy-five miles in length, which has its source in the State of Iowa, from whence it flows generally southeastwardly until it enters the district at or near its northwest corner at the point where it is crossed by U. S. Highway No. 61. Thence it proceeds eastwardly, but in a tortuous and irregular course, until it comes very near the town of Alexandria in the northeast corner of the district, whence it turns sharply and flows thereafter in a general southerly direction to the southeast corner of the district, where it passes under defendant's railroad track through what is known as the Gregory bridge, and empties into the Mississippi River. Fox River drains a long, narrow watershed of some 502 square miles, and is a "large watercourse," "fairly deep between the banks," though "filled up to a certain extent in recent years."

In addition to Fox River there are two lesser streams, for the most part well defined, which enter the district from the hills to the west of it, the one known as Sugar Creek, which is the first stream to the south of Fox River, and the other as Honey Creek, which lies still farther to the south. Sugar Creek flows in a general eastwardly direction until it unites with Honey Creek a little more than half the way across the district. From the point of junction the stream formed by the merger of the two is known simply as Sugar Creek, which continues to flow eastwardly until it empties into Fox River shortly after the latter makes its turn southwardly near Alexandria at a point approximately six miles north of the mouth of Fox River.

Other water comes into the district through what is known as Hemp Slough, which enters the district from the north near its northeastern corner and thence runs southeastwardly to an ultimate connection with Fox River. Though the record is not entirely clear upon the point, it would seem from testimony of some witnesses of both parties that all the water from the Des Moines and Mississippi Levee district which remains to be drained out of that district of 11,000 acres is either pumped or otherwise permitted to pass into the Hemp Slough, whence it is finally discharged into Fox River to be carried by it to its present sole outlet into the Mississippi River.

We speak of Fox River as presently having but the one outlet into the Mississippi River because of the fact that formerly it had an additional available outlet through what the witnesses referred to as Fox Slough, which lies in the northeast corner of the district, beginning generally at the point where Fox River turns southwardly near Alexandria and thence extending northeastwardly for a distance

of a mile and a quarter or a mile and a half to the southern limits of Alexandria, where the high waters of the Fox River formerly emptied out through it into the Mississippi River until defendant filled up such outlet with its embankment and blocked the further passage of water through it.

It is true that there was and still is considerable dispute in the case as to whether Fox Slough was properly to be regarded as a well defined watercourse and as a former natural outlet for the high waters of Fox River, but it is enough for our purposes merely to point out that the verdict of the jury for plaintiff has resolved these and all other conflicts in the evidence in favor of plaintiff's version of the facts.

The latter's evidence was to the effect that in the old days, when there was high water in Fox River, a part of it would go out under the 200-foot railroad bridge which formerly crossed over Fox Slough near Alexandria, while the remainder of the water would follow the present course of the river to the south and pass out into the Mississippi River under the Gregory bridge. This bridge at Alexandria, which was a trestle work on pilings installed at the time of the original construction of the railroad, was sometime later removed or changed by defendant, which elected to fill up the opening where the bridge had stood and to construct a regular embankment in the place of the bridge. Some years later the embankment was washed out by high waters, and again it was rebuilt; and so it stands to the present day, shutting off the natural and convenient outlet which the high waters of Fox River originally had through Fox Slough into the Mississippi River, and instead compelling the entire volume of water to be carried down the length of the stream to its one remaining outlet just north of the town of Gregory.

One witness said, "Fox River and Fox Slough is one thing." Other evidence disclosed that in the old days logs were moved out on rafts through the opening under the tracks for Fox Slough when Fox River was high; and that even today, in times of high water, the waters from Fox River still find their way up Fox Slough, and passing through the tiling in the dirt fill eventually reach the railroad embankment, which of course serves to block their further progress in that direction.

Indeed, in addition to the present outlet for Fox River at the Gregory bridge and its original outlet through the Fox Slough at Alexandria, there were formerly two other outlets which aided in permitting its high waters to escape and flow into the Mississippi River. One of such outlets, identified in the testimony as the Coyne place and located about one and one-half miles south of Alexandria, originally consisted of a trestle bridge, and even now the overflow waters from Fox River sometimes rise as high as the railroad tracks at that point, and seep and make their way through the rock fill where

the trestle formerly stood. The other opening, referred to by some of the witnesses as the Ice House place, also spanned by a trestle bridge, was located about three-fourths of a mile to the south of the Coyne place. One witness said the bridge at the Coyne place was thirty-five or forty feet long. Another estimated the length of the bridge at the Ice House place at seventy-five to eighty feet. Other witnesses gave somewhat lower estimates, but according to all of plaintiff's witnesses who testified on that subject those were substantial openings, not mere culverts.

Of course it was naturally true that when the several outlets in question were open the waters of the Mississippi River would sometimes make their way through them back into the lands of the district on those infrequent occasions when the Mississippi River was itself out of its banks, but even though this was true it could not have greatly militated against the service rendered by such outlets in generally permitting the escape of the high waters of Fox River in view of the showing in the case that Fox River has high water and gets out of its banks approximately twenty times as often as does the Mississippi. At none of the times counted upon by plaintiff in this action were there high waters in the Mississippi so as to have retarded the flow into it of the waters of Fox River.

So it is an undisputed fact that the only outlet left by defendant for Fox River to empty into the Mississippi River is through the opening under the Gregory bridge, and whereas the Gregory bridge with its approaches was originally 339 feet in length, in the year 1906 it was replaced by a single span bridge only 147 feet in length between abutments. Moreover the original bridge, inasmuch as it had been supported simply by two metal caissons set at either end of the central span and with trestle work at the extreme ends, had offered a minimum of resistance to the water passing under it, while in the case of the new bridge the large concrete abutments upon which it is made to rest are set at an angle to the course of the stream so as to retard and hold back the natural flow of the water and thus reduce the sectional area of the waterway. The abutments are not in the channel, that is between the banks, of the river, but plaintiff's evidence was that when the river is high the water first strikes the west side of the north abutment and is deflected across the natural course of the current toward the south abutment, which tends to obstruct and retard the flow of water from above. In the 1933 flood the south abutment was partially undermined by water thus thrown against it. Plaintiff's evidence tended to prove that the consequence of this mode of construction of the new bridge with its attendant resistance to the flow of the stream, together with the narrowing of the opening and the stoppage of the other outlets above mentioned, especially Fox Slough, has been to cause the bed of Fox River to fill up to an appreciable extent over a period of years so as to diminish the natural

capacity of the river to carry off waters during flood periods, and thus not only to result more quickly in overflows, but to hold the water upon the land for a longer period of time in those instances when the volume of high water is sufficient to cause the river to leave its banks.

As further illustrative of the extent to which defendant has cut off the natural drainage of the district, it is to be borne in mind that whereas the four original outlets for Fox River had comprised an aggregate width of over 600 feet, there is now but the one outlet of 147 feet under the Gregory bridge, which means that the outlet for waters from the district has been greatly reduced by defendant. It further appears that in the construction of bridges along U. S. Highway No. 61, through which the same waters come into the district as are later forced to seek an outlet into the Mississippi River through defendant's right of way, the State Highway Department allowed a total bridge clearance space of practically 850 feet as against the one outlet of 147 feet left by defendant under its Gregory bridge. Thus the inlet provided by the State Highway Department is 5.7 times as large as the outlet provided by defendant; nor do these figures take into account the fact that a very considerable volume of the water ultimately seeking an outlet into the Mississippi River under the Gregory bridge enters the district through Hemp Slough from the Des Moines and Mississippi Levee District to the north, none of which, of course, passes under the bridges constructed along the route of U. S. Highway No. 61. These facts bore directly upon the question of the adequacy of the opening left by defendant under the Gregory bridge, and the proper inference to be drawn from such facts was one within the province of the jury to determine.

There was evidence tending to show that because of the manner in which defendant had reduced and obstructed the natural drainage of the district, in times of flood the high waters would first fill up the depressions in the east end of the district and slow up the rapid current of the river; that with the current thus retarded at the point of outlet the natural consequence would be for a reverse or backward current to be set up from east to west; and that as the high waters would continue to be poured into the district, the levees would be broken and the river permitted to leave its banks and spread out and submerge the adjacent lowlands in which the land farmed by plaintiff lay.

Defendant has taken the position that the above is not true; that it was the fact of the construction of the numerous private levees along the streams which had served to affect the drainage and natural flow of the water throughout the district; and that because of the haphazard and improper construction of such levees, coupled with the fact of the tortuous and irregular course of the river itself, the re-

sult had been to hold back and retard the flow of the water, and to force it out of its banks upstream before ever reaching defendant's right of way.

Regardless of what there is to be said for defendant's theory of the case, there was nevertheless substantial evidence to support plaintiff's contention, and as an appellate court we are of course bound by the verdict of the jury insofar as the same was supported by substantial evidence, including the inferences legitimately deducible therefrom.

Witness Harry M. Bennett, a farmer residing in the vicinity of Alexandria, testified: "During the times of high water there is quite a swift current in these streams. It will flow faster than a man can walk or a horse can trot. I would say about ten miles an hour. After Fox River is up some few hours it fills the depressions in the east end and the banks, and as it rises it slows the current. The waters then come up."

J. W. Dienst, who is also a farmer within the district, testified: "When Fox River gets up and is rising the current is fast at the beginning of the rising of the river. Q. Then what? A. It rises and rises until it begins to fill up the eastern part of the district. Q. Then what? A. Backfires up through the center part of the district. . . . This condition has occurred quite often during the last eight years. Three or four times a year more or less. . . . The river rose and it ran down and began to back on the lowland and broke in the lower part of our district and filled up. . . . The water was flowing rapidly until it filled up and then the current slowed down."

Still another farmer, Ed. H. Dienst, testified: "When Fox River is up and at flood stage it is a rapid current at first. It slows up. When it slows down it seems to raise on the levees. When it gets in that condition the water goes around the levees and then backs in— south and west. . . . After Fox River gets high it comes back south and east of me."

One Alfred Edelman, a farmer residing southwest of Alexandria, testified: "Fox River will go down until it fills up and then you can see it coming in on the other side. . . . Q. What do you mean? A. Goes down on one side till it gets to the end and then backs up on the other side. Q. When it is backing up does it have much current? A. No sir. Q. When the river comes up—the river flows down rapidly till it backs up? A. Till it gets as far as it runs. Q. Then what? A. Then it backs up on me."

Plaintiff himself testified (speaking particularly of the 1933 flood): "I could see to the east and saw the levee on the Dienst land break. . . . The furthest levee east and south along Fox River is on land of Will Dienst. . . . The levee on the land of Will Dienst broke before my levee broke in the 1933 flood. In the 1933 flood the water at first began to come in on my land from the southeast."

In fact one of defendant's own witnesses, John H. Maddox by name, and a member of the board of supervisors of the Mississippi and Fox River Drainage District, testified: "When the water gets high, it comes back from the east to the west. Saw the water so backing on June 30, 1933."

There was also testimony that the high waters of Fox River, impounded as they would be by defendant's railroad embankment, had been known on occasions to rise to a point where they would run over defendant's tracks throughout the greater part of the distance between the towns of Alexandria and Gregory.

The three counts of the petition involve damage to plaintiff's crops from floods and overflows occurring on November 15 and 16, 1928, June 6, 1931, and June 29, 1933, with particular emphasis given in the testimony to the facts and circumstances attending the latter.

As has already been indicated, defendant makes much of its point that the overflow came on plaintiff's land before the flood waters had ever reached the mouth of the river at the Gregory bridge, and that consequently, under its theory of the case, any obstruction to the outlet for the high water could in no event have been the proximate cause of plaintiff's damage. Incidentally, the lands farmed by plaintiff lay from eight to fifteen miles upstream from the mouth of the river measured in terms of its tortuous and irregular course.

Now so far as the flood of 1933 is concerned, plaintiff's evidence was that his levee broke around two o'clock in the afternoon of June 29th, and there was evidence that by noon of the 29th Fox River was getting out its banks in the low places about a mile upstream from the Gregory bridge.

Witness Bennett testified regarding the 1933 flood that "when the water was coming up and breaking the levees there was not very much current in the stream," which, according to the testimony we have heretofore quoted, would have occurred after the depressions in the east end of the district had first been filled up so as to reduce the current and cause the volume of water to spread out over the banks and protecting levees.

But actually the element of time is not the only important factor in the case having to do with the question of the causal connection, if any, between defendant's negligence and plaintiff's resulting damage.

Witness Sheffler testified: "From Mt. Albia schoolhouse (which is located near the bridge on No. 61 over Fox River), southeast and east to the Mississippi River during the time I have been acquainted with Fox River it has been filling up. Two and one-half miles from where I was raised it is much shallower than when I was a boy. The railroad bridge over Fox River at Gregory has been shortened. That

has slowed up the river causing sediment to deposit. . . . I have noticed the current slowing up some for ten or fifteen years."

In other words, it was the filling up of the channel of the river as the result of defendant's obstruction to the river's outlet (or at least the jury might so have found), which diminished the natural capacity of the river to carry off waters during flood periods and made overflows more imminent and certain when an unusual volume of water was discharged into the district. Nor would such an inference be in anywise a strained one in view of the showing, not only that the outlets for high water through Fox Slough and at the Coyne and Ice House places had been shut off completely, but also that the span of the Gregory bridge had itself been reduced by more than half, to say nothing of the placing of its abutments so as to offer greater resistance to the stream. Undoubtedly there had been overflows in the district before the doing of any of the acts complained of on the part of defendant, but the result of shutting off and reducing the outlets in question must necessarily have been greatly to aggravate the hazard otherwise existing, and to more than offset the benefit of the system of private levees erected by the landowners in the district for the purpose of keeping the river within its banks. Indeed it was this very element of cause and effect which prompted witness Ed Dienst to testify: "I am bothered more now with floods than I was 20 years ago."

In his petition plaintiff counted upon the fact that defendant had wrongfully and negligently obstructed and impeded the natural and adequate drainage of the district by having raised and elevated its track and roadbed between Alexandria and Gregory; by having closed up one of the original outlets for Fox River through Fox Slough; by having closed up the two additional outlets at the Coyne place and at the Ice House place; and by having reduced the span of its Gregory bridge, which constituted the sole remaining outlet, from 339 feet to 147 feet.

Defendant's answer consisted of a general denial; of a plea of the Statute of Limitations as to any action for damages occurring by reason of the construction of the roadbed; and of a further plea that the damages, if any, sustained by plaintiff in June, 1933, as counted upon in the third count of his petition, had resulted from an act of God. The plea of the Statute of Limitations seems to have been abandoned. It is unavailing, as this suit was instituted less than five years after accrual of the first cause of action pleaded by plaintiff.

The reply filed by plaintiff was in the conventional form of a general denial.

■ The first point for our consideration involves the propriety of the court's submission of the case to the jury as against defendant's demurrers directed respectively to plaintiff's entire case and to each and every count of his petition.

Though, as we have already pointed out, there is some dispute in the case regarding the nature of plaintiff's cause of action, that is, as to whether it is founded upon the statute (Sec. 4765, supra), or whether instead it merely counts upon certain specific acts of negligence on defendant's part, we think there can be no serious doubt but that plaintiff is relying upon a violation of the statute.

It is true that he did not allude to the statute in his petition, but he is not to be precluded on that account from now insisting that his cause of action was nevertheless based upon the fact of defendant's violation of it. One who desires to avail himself of a public statute is not required to plead the statute by distinct mention of it or reference to it, but is only required to plead the facts which bring his case within its purview. [Emerson v. St. Louis & H. Ry. Co., 111 Mo. 161, 19 S. W. 1113; Moyer v. Chicago & A. Railroad Co. (Mo.), 198 S. W. 839; Williams v. Atchison, T. & S. F. Ry. Co., 233 Mo. 666, 136 S. W. 304.] In this instance the petition set forth facts and circumstances to bring the case within the contemplation of the statute, and it was alleged therein that the acts and omissions of defendant which were counted upon by plaintiff as constituting and evidencing his cause of action had been not only negligently, but also wrongfully, done. So the case is to be viewed and considered as one based upon the statute.

Now under the plain terms of the statute it is made the duty of a railroad company to construct and maintain suitable openings across and through its right of way and roadbed so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad, whenever the draining of such water has been obstructed or rendered necessary by the construction of the railroad. In other words, a railroad company must construct sufficient openings, trestles, or bridges to permit the waters of a natural watercourse to escape through its embankment and thereby connect with their natural outlet, if, as in this case, such a natural outlet exists; and so far as the term "surface water" is concerned, it includes that overflowing from a stream or watercourse as well as that falling as rain upon the surface of the land. [Goll v. Chicago & Alton Ry. Co., 271 Mo. 655, 197 S. W. 244; Wells v. Payne (Mo. App.), 235 S. W. 488; Brown v. St. Louis & S. F. Ry. Co., 212 Mo. App. 541, 248 S. W. 12; Harris v. St. Louis-S. F. Ry. Co., 224 Mo. App. 455, 27 S. W. (2d) 1072.]

In this instance not only did defendant cut down its Gregory bridge to a width shown to have been insufficient to accommodate the high waters of Fox River which were within the reasonable expectation of defendant in the light of all its experience with high waters in the district, but it also shut off the outlets at Fox Slough and the Coyne and Ice House places altogether. Moreover, Fox Slough and the Coyne and Ice House places, though perhaps no

longer watercourses in the ordinary sense of the term, having lost a portion of their identity as such because of defendant's wrong in having obstructed them and caused them to be filled up, are yet watercourses within the contemplation of the statute, and certainly were they so at the time. they were closed up and defendant's continuing wrong thereby committed. [See Murphy v. St. L.-S. F. Railroad Co., 205 Mo. App. 682, 226 S. W. 637; Coggins v. A. T. & S. F. Ry. Co., 215 Mo. App. 506, 256 S. W. 824.] Surely defendant, having wrongfully closed up such outlets and in a measure destroyed their former character as watercourses, should not now be heard to argue that the statute covers no such situation, and that there is no duty on its part to maintain outlet at such points along its right of way if such other outlets as it has are inadequate to provide for the necessary drainage of the district. [Grimes v. St. Louis & S. W. Ry. Co., 184 Mo. App. 117, 168 S. W. 317.]

To restate all the material evidence in the case would serve no useful purpose and but unduly lengthen this opinion which at best must reach more than the ordinary limits. Suffice it merely to point out that from the most favorable view of the case from plaintiff's standpoint, and it is only with that view of the case that we can be concerned on this appeal, there was substantial evidence to warrant and support the verdict which was returned. Plaintiff's burden of showing a causal connection between defendant's wrong and the resulting injury to his crops was sufficiently sustained as against its challenge by demurrer.

Defendant relies strongly upon Goll v. Chicago & Alton Ry. Co., 271 Mo. 655, 197 S. W. 244. That case is distinguishable in its facts from the instant case. In that case the plaintiff owned land north of the Missouri River, into which the water drained from his land. The railroad embankment complained of was south of and parallel with the river. The complaint was that the railroad had, by its embankment, dammed up a stream which had previously flowed northward under a trestle, thence east along the railroad and thence southward under another trestle to its ultimate discharge into the river. It did not serve to drain the plaintiff's land, being on the opposite side of the river. There was no complaint of any obstruction of the river or interference with its channel, nor was it claimed that there were any streams or drains through which water could escape from the plaintiff's land to the river and which the railroad company had obstructed. The complaint was that the railroad embankment prevented overflow water from the Missouri River on its south side from escaping southward, thus tending to cause said river to rise higher, overflow its north bank and submerge the plaintiff's land. We would have a similar case here if plaintiff's lands were *east* of the Mississippi River and he were complaining of an embankment which kept overflow water on the east side of that river from escaping eastward; but

we have not such similar situation. In the Goll case the court said, 271 Mo. l. c. 665, 197 S. W. l. c. 246: "It does not appear that the smaller streams mentioned in plaintiffs' petition (there were two) have any connection with the river north of the railroad. If either of those smaller streams extended from the channel of the river north of the railroad across the railroad to the river again on the south, and if defendant's roadbed obstructed such channel, there would be a different case here to consider." See in this connection Murphy v. St. L.-S. F. Railroad Co., supra, where the Goll case and Adair Drainage District v. Quincy, etc., Railroad Co., 280 Mo. 244, 217 S. W. 70, cited herein by appellant, are well considered and analyzed and the distinction between those cases and one such as we have before us is pointed out.

But defendant argues that in the case of the flood of June, 1933, which was covered by the third count of the petition, the high waters were so great and unprecedented as in any event to have excused it from liability for the damage done upon the theory of an act of God. There are two answers to this contention which at once suggest themselves from the record. In the first place, there was evidence to show that the flood of June, 1933, though high and destructive, was not unprecedented, but that in fact there had been at least one other occasion in the past when the water had been as high as in June, 1933.

Witness Kermit Dienst testified: "I think the flood in 1917 was a little higher at the house where I live now than in June, 1933. There was one flood in which the water got higher than it did in 1933. It got up on the floor in the house. The 1933 water did not get quite up to that mark."

Plaintiff himself testified: "The water in the Fox River District was as high on June 6th, 1917, as it was in June, 1933."

But aside from all this, in view of defendant's failure to have maintained sufficient outlets for the water through its roadbed, it would still be liable for the resulting damage, even though some outside and extraneous force, such as an act of God, might indeed have contributed with its own wrong to have produced the final result. Of course if it were conclusively established that the flood and volume of high water in June, 1933, was so great that the damage to plaintiff would have resulted regardless of any question of defendant's negligence or violation of the statute, then the damage to plaintiff would in legal contemplation be solely attributable to the extraordinary character and volume of the high water, and defendant would not be held liable therefor. This is the conclusion which defendant is arguing for in the presentation of its case on this appeal. However such was not the case under plaintiff's version of the facts, and the defense of act of God as to the third count of the petition is therefore

unavailing. [Tranbarger v. Chicago & A. Railroad Co., 250 Mo. 46, 156 S. W. 694; Hayes v. St. Louis-S. F. Ry. Co. (Mo. App.), 264 S. W. 683.]

■ The necessary elements of plaintiff's case were sustained as to each count of his petition. The scope of our review precludes us from any consideration of the question of the weight of the evidence, and it is for us merely to determine the legal proposition of whether there was substantial evidence to have warranted the submission of the case to the jury. The facts, when viewed most favorably from plaintiff's standpoint, answer this question in the affirmative. We see no escape from the conclusion that the court ruled properly in refusing all of defendant's requested peremptory instructions, and that the verdict for plaintiff is not to be overturned for want of substantial evidence to support it. [Hayes v. St. Louis-S. F. Ry. Co., supra; Wells v. Payne, supra; Robinson v. Chicago, R. I. & P. Ry. Co., 221 Mo. App. 881, 288 S. W. 109; Murphy v. St. Louis-S. F. Ry. Co., 205 Mo. App. 682, 226 S. W. 637; Hatswell v. Chicago, B. & Q. Railroad Co. (Mo. App.), 198 S. W. 85; Brown v. St. Louis & S. F. Ry. Co., supra.]

■ Defendant next voices complaint to the giving of plaintiff's Instructions P-1 and P-2, which were his principal instructions in the case. Such instructions read as follows:

"P-1. The court instructs the jury that it is and was the duty of the defendant railroad to cause to be constructed and maintained at all times suitable and sufficient opening or openings across and through its right of way and roadbed so as to afford sufficient outlet to drain and carry off all water that might reasonably be expected to flow or accumulate in Fox River and the streams and water flowing or coming into it, taking into consideration such overflow waters as might reasonably be expected to occur therein or therefrom in view of the size of the streams, its carrying capacity, the watershed of said streams, and the character of the country contributing to its flow and through which it flows.

"If, therefore, the jury find and believe from the evidence in this case that the defendant failed, if so it did, to construct and maintain opening or outlet through its right of way and roadbed at, along, and adjacent to Fox River mentioned and described in evidence, with sufficient capacity to permit the overflow waters, if any, to cross through or under its roadway into the Mississippi River, if you find from the evidence the Mississippi River was the natural and proper place for said overflow waters, if any, to go, that is, such overflow waters, if any, which said defendant railroad company should reasonably have expected would occur considering the size of said stream, its capacity, and the character of the country drained by it, or if you find and believe from the evidence that said railroad closed up openings, if such there were in or through its roadbed and right of way

through which said overflow, if any, of Fox River flowed, if such be the fact, and failed or neglected, if you so find, to open or keep same open at the place, if any, where the overflow waters, if any, of Fox River were or had been discharged into the Mississippi River, if such be the fact, and as a direct result or in direct consequence of such neglect, if any, or failure, if any, of said defendant railroad company, the waters or overflow waters from Fox River or its tributaries, if any, were caused to get upon and remain upon lands cultivated by plaintiff and described in evidence, and you find plaintiff, as a direct and proximate result thereof, suffered damages, if any, as may have been described in evidence, if you so find, either on or about November 16th and 17th, 1928; or on or about June 6th, 1931, or on or about June 29th, 1933, or on any or all of said times, then in such event, and if you so find, plaintiff is entitled to recover a verdict herein against the defendant, as to such time or times aforesaid, if any, he may have suffered such damages, if any.''

''P-2. The court instructs the jury that it was the duty of the defendant railroad company to so construct and maintain its bridge across Fox River at the place described in evidence a short distance above Gregory, Missouri, so as to permit an outlet of water passage sufficient to accommodate all water, whether surface or overflow water or water coming down Fox River and the waters emptying or coming into it above said bridge, and which waters defendant railroad might reasonably have anticipated would occur there, taking into consideration the lay of the country, the territory to be drained, and the watercourses; and if you find and believe from the evidence that the defendant railroad company failed to do this, and as a direct result thereof, plaintiff was damaged by the waters of said Fox River or its tributaries being held back or checked up, if so they were, and thereby caused to overflow or back upon lands occupied and farmed by plaintiff, if such be the fact, and stand or remain on plaintiff's crops mentioned in evidence, if such be the fact, and damaged or destroyed said crops, if any, then if you so find and believe from the evidence, you should return a verdict for the plaintiff upon such counts or causes of action in which you may so find and believe he was so damaged, if he was.''

Defendant filed a new brief after the case reached this court. In said brief it charges as error the giving of Instruction P-1 on the grounds:

a. That plaintiff's lands lay upstream and across the river from defendant's embankment and Section 4765, supra, does not apply to such situation;

b. That ''overflow waters which will drain off to the stream in course are not within the statute;''

c. That ''the obligation of the railroad under the statute is only to adjoining landowners.''

Defendant's contentions a and b seem to be on the theory of the decision in the Goll case and overlook or ignore the fact and effect of its above mentioned obstruction of the natural drainage of plaintiff's lands. The statute requires the maintenance of suitable openings in the railroad embankment so as to afford sufficient outlet to carry off the water ''including surface water,'' (which includes overflow water), ''whenever the drainage of such water has been obstructed or rendered necessary by the construction of such railroad.'' What we have said above we think sufficiently disposes of these contentions, adversely to defendant.

As to c defendant cites no case in support of its assertion that the statute applies only to an adjoining landowner. It is true the statute gives to an adjoining landowner and only to such, upon the railroad's failure to construct ditches, drains, openings, etc., the right to construct same himself and recover the cost thereof from the railroad company. But when it comes to providing for recovery of damages for such failure it says the railroad company shall be liable for ''all damages done by said neglect of duty.'' In the Goll case it is intimated, though not decided, that one not an adjoining landowner may maintain an action for damages under the statute. In Murphy v. St. L.-S. F. Railroad Co., supra, it is expressly so held. Such we think is the reasonable and proper construction of the statute, having in mind its evident purpose, as is pointed out in the Murphy case. If defendant's construction of the statute be correct one whose land is separated from the railroad right of way by only a narrow strip of land owned by another would be remediless. Neither the language nor the evident purpose of the statute calls for such narrow construction.

Instruction P-2 is criticized on the ground that it implies an obligation on the part of defendant to leave an opening at the Gregory bridge for overflow and surface water, whereas, defendant contends, ''the upper proprietor is only entitled to the natural flow of a natural stream within its natural channel.'' In view of the statute and in the circumstances of this case this contention cannot be sustained, for reasons which we think have been sufficiently indicated.

In Brown v. St. L. & S. F. Ry. Co., supra, the action was under the statute for damages due to the defendant's neglect to maintain an opening under a bridge across a creek of sufficient size to permit the waters of the creek in times of freshet to pass. The court said, 248 S. W. l. c. 15, that the defendant should have made the opening sufficiently large and, if necessary, should have extended it beyond the banks of the creek far enough, to have prevented the water from backing up so as to cause damage to land or crops above the railroad embankment.

In its brief filed in the Court of Appeals, certified with the record to this court, defendant makes other objections to said Instructions

P-1 and P-2, and certain assignments of error relating to admission of evidence, viz.:

It is argued that the two instructions were not predicated upon the grounds of recovery alleged in the petition; that they did not confine the issues to the pleadings and proof; and that they were vague, indefinite, confusing, and misleading, and in conflict with the instructions given for defendant. Bearing in mind that plaintiff's case is bottomed upon the statute and in view of the evidence and the instructions as a whole we think there was no prejudicial error in those respects in said two instructions. As to conflict with defendant's instructions, such conflict, if any, was because some of defendant's instructions were more favorable to it than it was really entitled to, which furnishes it no ground of complaint.

It is also said that the two instructions in question were erroneous in that they purported to cover the whole case and yet omitted any reference to the defense of act of God based on defendant's claim of an unprecedented rainfall. It is enough to say that the defense of act of God is an affirmative defense; that it was fully covered by certain of defendant's own given instructions; and that under such circumstances defendant has no present ground for complaint because such matter was not incorporated in plaintiff's instructions. [Wyatt v. Central Coal & Coke Co. (Mo. App.), 209 S. W. 585; Cottier v. Chicago, B. & Q. Railroad Co. (Mo. App.), 33 S. W. (2d) 173; Carson v. Missouri, K. & T. Ry. Co. (Mo. App.), 292 S. W. 1069; State ex rel. Jenkins v. Trimble, 291 Mo. 227, 236 S. W. 651.]

It is further claimed that the two instructions were erroneous in that they failed to include within themselves any rule for determining the measure of damages for the destruction of plaintiff's growing crops. This was not error, inasmuch as the question of the measure of damages to be applied was covered by other instructions in the case.

Finally it is said that Instruction P-2 was erroneous for the reason that it did not limit the question of the negligence of defendant in the matter of the construction of the Gregory bridge to that of its original construction, and for the further reason that it tended to make defendant a guarantor of the sufficiency of the openings, and declared a much greater duty to rest upon defendant than is prescribed by law.

We think there is no merit in this contention. This instruction, though limited by its terms to the question of the construction *and maintenance* by defendant of an inadequate bridge across Fox River, was nevertheless based upon the statute (Sec. 4765, supra), which has been heretofore considered and treated by the courts as having application to a situation where a railroad company maintains a bridge of an insufficient size or opening to permit flood waters to pass through and under it. [Brown v. St. Louis & S. F. Ry. Co.,

supra; Robinson v. Chicago, R. I. & P. Railroad Co., supra.] The duty declared by the instruction was the duty declared by the statute, and inasmuch as plaintiff was proceeding under the statute he was not to be held to the mere question of defendant's negligence or wrong in the original construction of the bridge. To the contrary, if the opening under the bridge was in fact inadequate to carry off such flood waters as were reasonably to be expected to come down Fox River, then its maintenance by defendant in that condition was a continuing wrong which gave rise to a cause of action whenever a loss occurred attributable to it. [Brown v. St. Louis & S. F. Ry. Co., supra.]

Turning to the matter of the admission of evidence, the point is made that the court erred in permitting plaintiff's witnesses, Nelson and Griffith, to testify to their respective conclusions as civil engineers that the opening under the Gregory bridge was inadequate to accommodate the waters of the drainage area served by Fox River. The contention of counsel is the usual one leveled at such character of testimony, which is that it called for the conclusions of the witnesses as to an ultimate fact in issue and thereby constituted an invasion of the exclusive province of the jury.

Defendant is not as consistent as it might be in claiming that the subject of the adequacy of the Gregory bridge was not one for expert testimony on the part of plaintiff's witnesses, since it itself used the same character of testimony as did plaintiff, and pursued the same line of inquiry of its own experts as did plaintiff in the two instances now assailed. We think, however, that all of such expert testimony was proper. It is true that the ultimate, issuable fact of whether the bridge in question was adequate and sufficient for the purposes it was reasonably expected to serve was one for the jury, but in resolving the conflicts in the evidence upon such point the jury were entitled to the aid of expert testimony such as that upon which plaintiff relied. Every one appreciates that the problems attending the construction of a large bridge require a knowledge of engineering far over and beyond the limited knowledge of an ordinary person untrained in engineering. No ordinary person could be expected to understand and appreciate the many factors that would have to be taken into consideration in determining how large an opening should be left under a given bridge, and consequently that question should be peculiarly one for expert testimony. The evidence in question was therefore not inadmissible as constituting an invasion of the special province of the jury, but instead was competent in the case upon a material fact in issue which the jury had the right to believe or disbelieve as they saw fit.

There is also something said in defendant's brief about the lack of adequate knowledge and information on the part of plaintiff's experts upon which to have based their opinions. Suffice it to say

that the sources and extent of their respective experiences and capacities were in each instance revealed to the jury, and if they might be thought to have lacked the necessary knowledge and information of the facts upon which to have based a worth while conclusion in regard to the subject of inquiry, it was only the weight and value of their testimony which was thereby affected, and not its competency under the rules permitting the introduction of expert evidence in proper cases. [Schoenherr v. Stoughton, 336 Mo. 290, 78 S. W. (2d) 84; Jones v. West Side Buick Auto Co., supra.]

For its next point defendant complains of the action of the court in having permitted plaintiff and three of his witnesses to testify in rebuttal that at a time near the end of the trial they had made an inspection and investigation in the vicinity of the Gregory bridge, and had found high water marks on trees along the Fox River indicative of the height to which the water had risen in the flood of June, 1933. The objection to such testimony is that it was properly a part of plaintiff's case in chief, and if introduced at all, should have been introduced in the course of plaintiff's case in chief, and not by way of rebuttal.

We think there was clearly no prejudicial error committed in this regard. Even if we should assume that the testimony in question was not in any sense rebuttal testimony, there would still be but little occasion to insist upon a reversal of the judgment because of its admission in evidence out of its proper course, since the order of proof is largely left to the discretion of the court, and it is within its sound discretion to allow the admission of evidence in rebuttal which should have been more properly offered as a part of the plaintiff's case in chief. [Koonse v. Missouri Pac. Railroad Co., 322 Mo. 813, 18 S. W. (2d) 467; Bennett v. Standard Accident Insurance Co. (Mo. App.), 264 S. W. 27.] However the evidence in question, while it might indeed have served a very legitimate purpose as a part of plaintiff's case in chief, was nevertheless rebuttal evidence in the sense that it came in response to and in rebuttal of certain of defendant's evidence to the effect that for the distance of a quarter of a mile north upstream from the Gregory bridge the river had not been out of its banks in the June, 1933, flood. It follows that in this view of the situation the court could not be put in error for having permitted the introduction of such evidence by plaintiff after defendant had closed its case, no abuse of its discretionary power in any event appearing. [Hinds v. Chicago, B. & Q. Railroad Co. (Mo. App.), 85 S. W. (2d) 165, 172.]

The last objection to the admission of evidence is that the court erred in admitting all the testimony offered by plaintiff as to the market value of the crops destroyed as of a date at and after their harvest time. Counsel concede that such evidence might have been competent as to the second count of the petition which involved

a loss occurring in the month of November after the crops had matured, but they insist that it was incompetent as to the first and third counts of the petition which involved losses occurring in the month of June while the crops were immature and at a time when no one could have foretold what considerations might have affected their further growth and maturity.

Again defendant is wrong in its contention. There is no controversy over the fact that the jury were instructed as to the correct measure of damages, which was the value of the crops standing in the fields at the time and place of their destruction. However, to prove such value, and to give the jury the benefit of the facts and circumstances from which such value could be determined, plaintiff introduced the evidence in question which tended in a general way to show the probable yield of the crop and its value at the time of its maturity and market, less, of course, what would have been the necessary cost of cultivating, harvesting, and marketing the same. Under the authorities having to do with similar situations all such evidence was competent upon the question of the loss sustained by plaintiff at the time and place of the several overflows, and there was therefore no error committed by the court in allowing the same to be admitted. [Anderson v. St. Louis, I. M. & S. Ry. Co., 129 Mo. App. 384, 108 S. W. 605; Hunt v. St. Louis, I. M. & S. Railroad Co., 126 Mo. App. 261, 103 S. W. 133; Pace v. St. Louis S. W. Ry. Co., 174 Mo. App. 227, 156 S. W. 746; Uhrhan v. Morie (Mo. App.), 293 S. W. 483; Reed v. Cullor (Mo. App.), 32 S. W. (2d) 296.]

An additional abstract of the record has been filed by plaintiff, which has been considered by us only in the light of defendant's written objections to it.

The judgment rendered by the circuit court should be affirmed. It is so ordered. *Westhues* and *Bohling, CC.,* concur.

PER CURIAM:—The foregoing opinion by COOLEY, C., is adopted as the opinion of the court. All the judges concur.