Charles PETERS, Respondent,

v.

Lee B. SHULL and Isal Iona Shull, Husband and Wife, Appellants.

No. 23981.

Kansas City Court of Appeals.

Missouri.

June 1, 1964.

Robison & Miller, Maysville, for appellants.

J. B. Beavers, Cameron, for respondent.

HUNTER, Judge.

This is an action for damages alleged to have been sustained by plaintiff-respondent, Charles Peters, as the result of the defendants-appellants Lee and Isal Shull, having changed the grading and having raised the elevation of portions of their adjoining lot causing surface waters to be artificially collected and discharged in a body on plaintiff's lot and house causing it to be permanently damaged. The parties waived a jury, and the trial by the court resulted in a judgment for plaintiff for $600.00. After an unavailing motion for a new trial, defendants appealed.

This being a jury waived case, our duty is to review it upon both the law and the evidence as in suits of an equitable nature. The judgment is not to be set aside unless clearly erroneous, and due regard must be given to the trial court to judge the credibility of the witnesses. S.Ct.Rule 73.01(d), V.A.M.R. This we proceed to do.

Mr. and Mrs. Harry Groves originally owned a tract of land in Cameron, Clinton County, Missouri, that had a 254 foot frontage north and south on Walnut Street with a 342 foot depth. They sold the defendants the south 100 feet. According to defendants' evidence the portion the Groves retained and the portion defendants purchased were so sloped that the surface water

runs to the south onto the lot later purchased by plaintiff.

Shortly before October 14, 1961, defendants commenced the construction of a house about the middle of their mentioned lot. The excavation for the basement was about 30 feet wide by about 80 feet in length. The dirt was piled up around the east side of the excavation and the basement walls were starting to be laid when plaintiff, a day or two before October 14, 1961, purchased from Ted Sanders for $4,100 the lot known as 725 South Walnut which lay immediately south of defendants' lot. After plaintiff had purchased the lot defendants had a "dozer" push some dirt from west to east "down in front of the house to raise the fill up in front of the house". Dirt was pushed next to the foundation to keep the water from running in around the foundation. "And he (defendant) built a patio on the back and raised the ground approximately three feet." The obstruction created by defendants was a few feet high and ran the full width of the lot, north and south. The west end of defendants' lot before any construction on it had taken place was higher than the east end. The natural lay of the land on defendants' lot was changed by the excavation for the house and the piling of the dirt thereby obstructing the water. The result, according to plaintiff, was that "the water runs from the west to the east and goes as far as the fill put in around the foundation, and then turns directly south onto my property."

On this appeal defendants make two ("points") contentions. The first is that "Surface water is a common enemy and a person may divert it from his premises so long as he does not do so recklessly, or impound or collect it and discharge it upon the servient estate in increased quantities to its damage. (and) If as a result of normal construction procedures, the natural flow of surface water be changed by the dominant owner, the servient owner is not entitled to damages."

While defendant in his mentioned contention ("point") has not pointed out wherein or how the trial court erred (See S.Ct. Rule 83.05 (a) (3), as illuminated in the discussion portion of his brief it is defendants' contention that the evidence does not support the trial court's finding "that in the course of such construction defendants caused previously existing natural surface water to become collected into an artificial channel or swale, in an artificial volume, and in a manner not merely incidental to proper improvement of their premises * * (and) precipitated the natural surface water so artificially collected upon plaintiff's property in an unnatural manner by causing same to be discharged onto plaintiff's property at a point or points different from the conditions existing prior to defendant's construction." Defendants assert there is no evidence that they *collected and discharged* the surface water onto defendants' property.

Accordingly, defendant Lee Shull testified that at the time he bought his lot the middle part of the Groves lot on the north of it sloped to the north and the other part to the south; that both his and the Groves lot sloped from the west to the east, about two-thirds of the way down and from there on sloped south and that all surface water from both lots drained south and onto the Peters lot. There was a swag on his (defendant's) lot and it sloped to the south. The water had flowed off Shulls' lot onto Peters' lot about where Peters' garage was located, because it was lower there and there was nothing to stop the flow of the water. This was the natural flow of the water when Shulls bought their property. The only change in the flow of surface water after construction on their property by defendants was that due to guttering and piping of roof water to the street and away from their house at least one-third of the water which formerly flowed onto plaintiff's lot does now.

■ The legal doctrine involved, although variously stated, is generally well settled. In Haferkamp v. City of Rock Hill, 316 S.W.2d 620, our supreme court illustrated the general rule in this state by reference approval of several earlier appellate decisions. (Local Cit. 316 S.W.2d 625) "In Clark v. City of Springfield, Mo.App., 241 S.W.2d 100, 105, it was stated that 'one should not artificially impound or collect surface water and cast it in increased and destructive quantities upon the servient estate to its damage.' In the recent case of Blydenburgh v. Amelung, Mo.App., 309 S.W.2d 150, 152, it was stated that 'the owner of a dominant estate cannot permit water to collect on his own premises and then discharge it in destructive quantities at one point in a body onto the servient estate.'" And see Blackburn et al. v. Gaydou, 241 Mo.App. 917, 245 S.W.2d 161, 166.

■ The supreme court noted the general rule is subject to a qualification, saying in the Haferkamp case, 316 S.W. loc. cit. 625: "In those states purporting to follow the common enemy doctrine, where the question of the right of a landowner to collect surface water and discharge it into a natural drainway has been expressly raised, the courts 'have developed a qualifying rule which is, in subtance, that a possessor of land is not privileged to discharge upon adjoining land, by artificial means, large quantities of surface water in a concentrated flow *otherwise than through natural drainways*' (emphasis added). See the discussion by Kinyon and McClure, 24 Minn.Law Rev. at pp. 916 et seq. The statement of this general qualifying rule varies in the numerous cases, and without attempting to state precisely its limits it may be said that the rule is, in subtance, that a landowner in the reasonable use and development of his land may drain it by building thereon sewers, gutters and such other artificial water channels for the purpose of carrying off the surface waters into a 'natural surface-water channel' (see Todd v. York County, 72 Neb. 207, 100 N.W. 299, 66 L.R.A. 561) located on his property without liability to the owner of neighboring land, even though such method of ridding his property of surface water accelerates and increases the flow thereof, provided that he acts without negligence, and provided further that he does not exceed the natural capacity of the drainway to the damage of neighboring property."

■ We have reviewed the evidence in the light of defendants' first contention of error and find that contention to be without merit. The evidence discloses and is persuasive that prior to plaintiff's purchase of 725 South Walnut lot the surface water flowed generally to the south from defendants' lot onto plaintiff's lot in such a diffused manner as to cause no damage to plaintiff's lot and his house thereon.

Defendants' own witness, Harry Groves, testified that prior to defendants' mentioned construction the water from defendants' lot "was standing, but as far as running in the blue grass I never saw any water running * * *. It might have run off slowly, but it stood pretty much." Groves never saw any water running on plaintiff's lot. However, as a result of the construction work, "it is graded from the (defendants) house and it goes down, so there is a swale there. * * * Q. Before you sold the lot to him (defendant) was there a swale or depression or ditch in there? A. No, sir. It naturally sloped all the way. * * * Q. That swale or depression you spoke of, that was created after Mr. Shull started his construction of his house, is that right? A. By grading, yes. Q. That water that comes into the swale or depression, does that go south? A. Have to go south, yes. Q. Goes south and collects right there in that swale or depression that you spoke of, is that right? A. Yes. * * * And it collects there and flows onto Mr. Peters doesn't it? A. Yes. * * * Q. And that is no different now than it was before? A. Only

that it goes off in one spot now. * * * But it didn't go off in one place like it does now? A. No, sir."

Plaintiff's witness, Russell Johnston, a county engineer and surveyor, testified that after the mentioned construction the slope of the land was such as to collect 'he water on defendants' lot "in one volume" and that it would empty on plaintiff's property.

Ted Sanders testified that when he owned the property in question surface water from defendants' lot flowed from east to west and continued to the Shull side of the property and emptied from there into the street but that as a result of the building on the Shull property "the water is diverted in its drainage from the west directly —well, when it comes to the Shull house it drains directly south onto the Peters' property. * * * It is a man made drainage. * * * What I would call a spillway. * * * I never before saw where a man would simply impound the water and put it onto another man's property. * * * He (defendant) piled the dirt up (3 feet) the full width of the lot." And that another result of this grading was to cause a depression or low place about 50 to 70 feet long and about 33 feet wide. Sanders also stated that prior to the construction "For the past 30 years there was no water that drained from the Groves property onto the Peters' property, with possibly a few feet from the east line."

Plaintiff testified that as a result of defendants raising the elevation for their yard, house and patio the surface water flows somewhat west to east as far as the fill and then is diverted directly onto his property running under his house, flooding his basement, causing the floors to be wet and making his garage and driveway not usable. Prior to the construction work he knew of no such flooding.

Other evidence also supports a finding that as a result of the grading and construction work done by defendants the surface water is now collected in one body and discharged at a point where it runs in

and under plaintiff's house in one body causing substantial damage.

■■ Defendants remaining contention ("point") is that "No Satisfactory proof was offered on the question of damages. If any damages were occasioned by respondents these had, at least in part, been sustained at the time of sale and are presumed to be reflected in the sale price and cannot be claimed by respondent. (And) there was not proof of the value of the property before or after the injury."

The applicable rule is that in an action for injuries to real property by the wrongful impounding and discharge of surface waters, such as here, the measure of damages is the same as in other cases of injury to such property. When the damage to real estate is permanent and the injuries are of a major character, the proper measure of damages is the difference between the market value of the property immediately before and immediately after the injuries occurred. Belveal v. H. B. C. Development Company, Mo.App., 279 S.W. 2d 545, 554. There must, of course, be evidence of such values.

■ Both the plaintiff and Ted Sanders, who qualified as an expert, testified without objection that plaintiff's property was worth $4,100 at the time plaintiff purchased it but was worth only approximately $2,000 after the mentioned water damage. Plaintiff testified he paid Sanders $4,100 for the property. And as earlier mentioned plaintiff described some of the damage he claimed the flooding caused to his house, garage and driveway. This is pertinent and substantial evidence of the permanent damage plaintiff asserts as having been caused to his property by the flooding, and defendants' contention to the contrary is without merit.

■ As to defendants' contention that the damage, if any, had been sustained at least in part before plaintiff acquired the property, the evidence adduced by plaintiff disclosed the damage that occurred after

plaintiff's purchase of the property. In so saying, we have not overlooked evidence adduced by defendants to the general effect that water had run into the back room of plaintiff's house from a leak in the roof and had deteriorated a spot on the floor and one or two floor joists. There was also evidence that the house was 50 years old and was in a somewhat deteriorated state prior to plaintiff's acquisition of it. This evidence was before the trial judge who presumably carefully considered it as have we. The trial judge allowed only $600.00 of the $2,000.00 asserted permanent damages, and on our own independent review of the record we are inclined to agree with that figure. Certainly, no clear error is demonstrated by defendant as to the amount of damage determined by the trial court.

The judgment is affirmed.

All concur.