**NORFOLK AND WESTERN RAILWAY COMPANY, Respondent,**

v.

**Kenneth J. GREENING et al., Appellants.**

No. 54665.

Supreme Court of Missouri, Division No. 2.

Sept. 14, 1970.

Motion for Rehearing or to Transfer to Court En Banc Denied Oct. 12, 1970.

Albert E. Schoenbeck, St. Louis, for respondent.

Paul Brackman, Brackman, Copeland, Oetting, Copeland, Walther & Schmidt, Clayton, Samuel C. Ebling, Millar, Schaefer, White & Ebling, St. Louis, for appellants.

MORGAN, Judge.

In this condemnation proceeding plaintiff seeks "to condemn and appropriate" 2.6 acres of land owned by defendants "for railroad purposes, including use of same for tracks, yards and miscellaneous structures and facilities." The jury assessed damages at $50,500 and defendants have appealed.

The record covering the six day trial makes it apparent each party exhausted every effort to present all available evidence, but we will attempt to detail only those facts required to resolve the issues now presented.

The land in question is located in St. Louis County near Lambert Field in an industrial complex between Interstate Highways 70 and 270. On June 10, 1963, defendants purchased for $100,000 approximately 19 acres of land in the area near the east terminus of a street identified as Ford Lane. However, we are concerned only with the most eastern contiguous 7.7 acre portion thereof. This tract was divided by Cold Water Creek which extended generally in a northerly and southerly direction. The creek was approximately fifty feet wide and twenty feet deep and covered .915 of an acre. As divided, there remained 5.960 acres west of the creek and .825 of an acre on the east side. Of that part west of the creek, plaintiff seeks to condemn 2.6 acres.

Prior to date of taking on December 8, 1967, the land in question was burdened

by two easements in favor of the Metropolitan Sewer District. The first for water drainage was 100 feet wide and followed the course of the creek. The second for an underground sanitary sewer was 36 feet wide and extended along the west edge of the 100 foot drainage easement. The 2.6 acres sought by plaintiff comprised a strip 220 feet wide extending over the sewer easement and adjacent to the west edge of the drainage easement. It was agreed the taking was subject to the restrictions of the sewer easement.

■ First, defendants submit that the trial court erred when it entered the initial order for condemnation and appointed commissioners to determine damages on September 8, 1967, for the reason the proposed taking was for a private instead of a public use. It is then suggested, in view of the fact plaintiff has taken possession and constructed the proposed railroad tracks, that the cause should be reversed and defendants permitted to pursue such further remedies as were reviewed in Hayden v. Grand River Mutual Telephone Corp., Mo.App., 440 S.W.2d 161. Such possibilities become of interest, however, only if it be determined the original order of condemnation was improvidently entered; and that order, being interlocutory when made, can now be considered on appeal. "Even though a defendant may contest the right of the plaintiff to condemn, the judgment in such a case is not final or appealable until after the commissioners file their report and the exceptions thereto, if any, are tried and the amount of damages finally fixed." State ex rel. State Highway Commission v. Hammel, Mo., 290 S.W.2d 113, 117.

■ The right of plaintiff to seek condemnation can not be denied. Art. 11, Sec. 9, of the 1945 Constitution of Missouri, V.A.M.S., declares railroad corporations to be "common carriers" and Section 388.370, RSMo 1959, V.A.M.S., specifically provides in part: "Any railroad company in this state shall have the right to take and hold all necessary ground for * * * sidetracks and other necessary purposes * * * as is now provided by law for the condemnation of other lands." However, when such power is exercised, and " * * * an attempt is made to take private property for a use alleged to be public, the question whether the contemplated use be public shall be judicially determined without regard to any legislative declaration that the use is public." Art. 1, Sec. 28, 1945 Constitution of Missouri. On this issue the following portion of the record is relevant:

Plaintiff's witness: (Direct)

Q  Will you tell the Court the nature and extent of the general railroad purposes for which this land is needed?

A  It is our intention to construct a railroad running off of a track leading to Ford Motor Company with five tracks adjacent to Cold Water Creek over this property to be used for the storage of and handling of freight cars.

Q  So that this 2.6 acres will be part of an overall railroad yard?

A  Yes, sir.

Q  And cars which would be brought in and used in that yard would be cars transported in both intrastate and interstate commerce?

A  Yes, sir.

Q  It would be used for carrying out general railroad purposes of the Norfolk and Western Railway Company?

A  Yes, sir.

(Cross-examination)

Q  * * * you say there are going to be five tracks in this area * *?

A  Yes, sir.

Q  Where do those tracks lead?

A They lead to—track leading to Ford Motor Company and they extend to the end * * *

Q The end of your general railroad track?

A They are part of the Berkeley-Robertson Industrial Complex.

Q How far is your line from this point, your regular line, the main line?

A Approximately three quarters of a mile.

Q Really the only purpose of this line is to serve the Ford Motor Company, is it not?

A The purpose of constructing the yard is to relieve other tracks in the area to handle business for Ford Motor Company. We have a number of other industries in the area.

* * * * * *

Q But isn't the real purpose of this to serve Ford Motor Company. It has no other general railroad purposes other than that?

A Yes

Q What are those general purposes?

A We're having difficulty serving the industries in this area due to increased business by Ford Motor and an increase in the size of the industrial complex in the last * * *

Q What industrial complex are you referring to?

A Berkeley-Robertson-Hazelwood Industrial Complex. Within the last two years there have been warehouses located by Olin-Mathieson, Edsel Company, Obermeier and others.

Q Do all these companies have spur tracks leading from this general area to which this general area will provide access?

A Yes, they do.

Q The cars from those areas will have access to this area you're seeking to condemn?

A The cars for the other industries will have access to these areas, but those cars—it is not our intention to keep them in this immediate area.

* * * * * *

(Redirect)

Q * * * the industries you mentioned, those in the Robertson-Hazelwood-Berkeley complex, they at the present time are not receiving adequate service due to shortage of space in the area for you to carry out the general railroad purposes?

A We have had considerable complaints from our customers in the Berkeley area about service.

Q Out of what situation do those complaints arise?

A The fact that we have more cars than we have track space to place them on.

■ At this original hearing, defendants offered no evidence to develop their present argument the taking was for the private use of Ford Motor Company, but relied on plaintiff's obligation to establish the taking was for a public use. On the testimony as outlined, the trial court found the taking to be for a public use. Defendants rely primarily on the question and answer: "Q—But isn't the real purpose of this to serve Ford Motor Company. It has no other general railroad purposes other than that? A—Yes." However, if isolated portions of the testimony are not taken out of context, we believe the trial court's conclusion to be both reasonable and proper. It was established that other industries, as well as Ford, were expanding rapidly in the area; that there was a shortage of storage area for the rail cars needed; that this shortage prohibited plaintiff from providing adequate service to other customers in the area; and that the

problem was not limited to the demands of Ford. Even though Ford, as a single customer, may derive a substantial benefit from the expanded facilities, the contemplated improvement in service to other industries makes the "public" benefit more than what might be classified as an "incidental" benefit. Missouri, Kansas and Texas Railway Company v. Freer, Mo. App., 321 S.W.2d 731, 737. The fact Ford, by the very size of its operation in the area, may demand more rail service than others does not necessarily make the project for the private benefit of Ford. We have considered all cases cited by defendants on the issue in question, and all follow the constitutional mandate that the taking must be for a "public use." However, as is generally true, the ultimate conclusions reached did turn on the particular facts of each case. "There is no fixed or stereotyped definition of the term 'public use.'" In Re Coleman Highlands, Mo., 401 S.W.2d 385, 387. From the record before us, we conclude that the taking was reasonably necessary to facilitate the operation of plaintiff's business to provide service as a "common carrier."

■■■ Second, it is contended that the trial court erred in allowing an "expert" witness to testify for plaintiff regarding the cost of building a bridge across Cold Water Creek. The need for plaintiff to offer some evidence on the subject was created by defendants' effort to establish the value and potential use of the wooded tract of .825 of an acre east of the creek. This area was bordered on the east by lands of others in addition to other railroad tracks. With the worthy objective of establishing "all the uses to which the property may best be applied or for which it is best adapted, under existing conditions and under conditions to be reasonably expected in the near future," M.A.I. 16.02, defendants sought to establish the feasibility of a bridge across the creek connecting both areas of the 7.7 acre tract. They offered in evidence a letter from an official of the Metropolitan Sewer District that engineering studies had been made to widen the creek, but "In the meantime we would approve construction of a sixty foot span across the creek on a temporary basis." An engineer was then offered to testify the estimated cost would be between $14,400 to $17,280 to build a "sixty-foot span" of concrete "twenty-four feet" wide to carry traffic with "twenty ton loading" to meet "highway department specifications." In response thereto, plaintiff offered the witness whose testimony is now challenged. His qualifications were such that defendants concede it "would be mere folly" to question his status as an expert in bridge building, and agreed he was the leading consultant in building bridges for the interstate highway system. Such experience included supervision of the designs and specifications for approximately 80 bridges in the St. Louis area. When the witness started to express an opinion as to the estimated cost of the bridge, after objection, it was brought out that the witness had not personally checked soil conditions at the proposed site. Even though he replied "yes" when asked if he was familiar "with the terrain in the vicinity between 270 and 70 along the Cold Water Creek," plaintiff limited inquiry to the cost of building the bridge itself and not the approaches or piers to support it. As so limited, the witness estimated the cost at $28,000. It was clearly brought out before the jury that this figure did not include those items that might vary with soil conditions. As an admitted "expert," the witness could express an opinion supported by a factual basis. Absent personal knowledge, this requirement is met when the conclusion is premised on facts, assumed to be true, and as to which evidence has been received. State ex rel. State Highway Commission v. Koberna, Mo., 396 S.W.2d 654, 663. Defendants placed before the jury the specifications noted, and we find no reason why plaintiff could not rebut the particular evidence offered by an opinion based on such specifications.

■ Third, it is argued the trial court erred in not striking certain testimony of another witness for plaintiff. He was identified as Director of Engineering for the sewer district and was called to detail the extent of the district's easement. His presence was occasioned by defendants' earlier suggestion that if there was to be testimony reference the easements, it should be by someone from the district. He had with him Ordinance No. 1815 (presumably passed by the district trustees) detailing such information. By agreement the ordinance was admitted in evidence. While the witness was reading from and being interrogated about the ordinance, to the apparent surprise of all it was noticed that the particular ordinance had been passed subsequent to the date of taking. There is no suggestion of trickery or sharp practice. However, the new ordinance not only retained the original easement of 100 feet, but had added a restriction against buildings within an area 165 feet on each side of the center of the creek. The parties disagree as to the extent of relief requested by defendants' objection. In any event, it is clear the objective was to withdraw such new building restrictions from consideration by the jury. The court's ruling, in part, was: "Your prior objection is sustained and the jury is instructed to disregard any testimony given by this witness as it relates to an alleged building line existing a hundred and sixty-five feet on either side of the center line drawn by this witness." The lines referred to had been placed on one of the large plat exhibits before the jury. The court went on to instruct: "The jury will disregard the lines of this witness as it relates to Exhibit A and further relates to the alleged building line one hundred and sixty-five feet from the center line on the creek." From the record, we find the court fully complied with the relief requested. Even if the objection were to be construed as directed toward the entire ordinance, we find nothing in the record, except such new building restrictions, that in any manner could have been prejudicial to defendants. It is conceded the 100 foot and 36 foot easements were in effect at all times of interest. We do not find any merit in the argument as made.

■ Fourth, it is submitted that reversible error resulted from the manner in which the trial court handled an objection to a portion of plaintiff's closing argument. Based on the fact the 1963 purchase by defendants averaged twelve cents a square foot, while they thought at time of trial it was worth seventy-five cents a square foot, the argument was: "* * * if you would take the same figures over into the residential field and multiply by six hundred and twenty-five percent it would mean that a house you could have bought on June 3, 1963, for twenty thousand dollars, you could have sold on December 8, 1967, for one hundred and twenty-five thousand dollars. And I say that this is just ridiculous." Upon objection, the court advised the jury to be governed by the evidence and not to consider arguments of counsel as evidence. Although it be assumed that the argument was improper and the court's ruling somewhat inadequate, we do not believe reversible error resulted. It was a brief reference in a long argument at the close of a long trial, and defendants' counsel in later argument fully exposed the fallacy of the argument made. Of course, closing argument should be based on facts in evidence, Davis v. City of Independence, Mo., 404 S.W.2d 718, 720, but counsel is allowed wide latitude in arguing inferences that at first blush may appear both illogical and erroneous. Eickmann v. St. Louis Public Service Company, Mo., 323 S.W.2d 802, 810. Furthermore, a trial court is allowed wide discretion in controlling argument of counsel, and absent a clear abuse of such discretion, its ruling should control. Helfrick v. Taylor, Mo., 440 S.W.2d 940, 947. While considering the motion for new trial, the trial court had an opportunity to consider any possible prejudicial effect of the argument within the

context of the entire case, and now having done so from the printed record, we find no merit in this assignment of error.

■ Lastly, it is submitted that the award of $50,500 for the 2.6 acres taken was inadequate. This issue was not presented to the trial court in the motion for new trial and has not been preserved for appellate review. Rule 79.03, V.A.M.R. However, as further evidence the trial was free of prejudicial error, we do observe that the award was within the estimates of damage submitted by the parties.

The judgment is affirmed.

All of the Judges concur.