Lawrence L. HAWKINS and Louise S. Hawkins, Respondents,

v.

BURLINGTON NORTHERN, INC., Appellant (two cases).

No. 58443.

Supreme Court of Missouri, En Banc.

Sept. 9, 1974.

Rehearing Denied Oct. 14, 1974.

Walter A. Raymond and Raymond, West, Shy & Morris, and Edward L. Simmons, Kansas City, for respondents.

Clyde J. Linde, Billy S. Sparks, Kansas City, for appellant; Linde, Thomson, Van Dyke, Fairchild & Langworthy, Kansas City, of counsel.

Sam D. Parker, Jack W. R. Headley, Kansas City, for The Atchison, Topeka and Santa Fe Railway Company.

PER CURIAM:

After opinion, the Court of Appeals, Kansas City District, transferred these two cases, consolidated for purposes of appeal, to this court. The opinion was written by Pritchard, J., and made the following disposition of the same:

"These two flooding cases were consolidated upon appeal. The first, No. KCD 26077, was tried in DeKalb County upon the theory of common law trespass for flooding of a portion of 24 acres of land for the years 1951, 1952 and 1953, and resulted in a judgment pursuant to the verdict of a jury for a total of $4,100.00 for the three counts for actual damage. The second, No. KCD 26187, was tried in Clinton County upon the theory of common law nuisance for flooding of a portion of 18 acres of land for the years 1962, 1963, 1965 and 1966. The Clinton County case resulted in judgment after jury verdict in the total amount of $4,956.75 actual and $8,000.00 punitive damages for the four counts of the petition.

The facts which are common to both cases are these: In 1949, Burlington's predecessor condemned a portion of 75 acres in order to construct railroad tracks to provide a shorter route between Kansas City and Chicago. Before the condemnation award, respondents bought 75 or 80 acres, which they had rented since 1946, from their aunt. The $10,000.00 purchase price was made up of $6,500.00 from the

condemnation award and $3,500.00 cash paid to the aunt.

Prior to the time in 1950 when Burlington began construction of the line, the natural drainage of the area was from about 340 acres coming out of hills and draining north toward Turkey Creek, down a slope of 3 to 4 degrees. There were then two natural drainage ditches, an east ditch called the Anderson ditch, and the west ditch called the north-south ditch. Respectively, these two ditches drained 240 and 40 acres, and met and joined with what is known as the Hawkins ditch (which drained to the west) below and off of Burlington's right of way, adjacent to respondents' 18 acres claimed to have been flooded. Anderson and Hawkins, in 1947, prior to respondents' purchase of the land from their aunt, hired a bulldozer to straighten and clean out their ditches, which were then about 12 feet wide at the bottom and 4 to 5 feet deep with a 2 to 1 slope on each side. About 20 acres north of the right of way drained into the ditch below it, about where Burlington's culvert was later constructed. As shown by the plats and maps, the Anderson ditch flowed northwesterly, and about where the embankment was later constructed curved to the left and west and flowed directly into the Hawkins ditch. The north-south ditch flowed north and joined the Hawkins ditch at about right angles. The construction of the culvert caused both ditches to join in one stream the Hawkins ditch at about a right angle, not in alignment with any previous drainage pattern, rather than as before, the Anderson ditch (draining the larger area) flowing directly into it, and the north-south ditch (draining about 40 acres) flowing separately into it at right angles.

In 1950 Burlington constructed an embankment 18 feet high through the area of the two ditches, and their course to the south of the embankment was altered so that the flow of water would meet 200 feet to the west of the Anderson ditch and 125 feet east of the north-south ditch, after which the water would pass through a culvert, the original channels of both ditches being thereby blocked on the south side of the embankment. The culvert was constructed of concrete, 8 by 8 feet in size, and according to respondents' civil engineer expert, Col. des Islets, was properly placed, adequate in size, and the ditches below it were adequate to handle the water, but the problem was in getting the water from the culvert into the (Hawkins) ditch below so that the water would turn 40 to 45 degrees to the left and flow in the right direction. As it was at the time of the trials, Col. des Islets described, in the DeKalb County trial, what Burlington's engineer had done in these words: 'He did a fine job as far as adequacy of size is concerned, but when it come to the outlet he disregarded the nature of the water flow and failed to take care of it the way he should have and put it back in the stream where it belonged. * * * Now, the thing that is happening right now: the water comes out here and hits against this bank. And as it drops down into the bank, it starts a boiling like this and forms a water dam. As it gets higher it forms a water dam. Now, the higher that water comes on the bottom end of that box the less flow will come through the box. This is pretty reasonable. I think anybody can understand that. So the higher this boil comes back up, the slower your water comes through the box. And that's the trouble with this thing right here. Now, what it needs is to be projected out here and a 45-degree wall taken here so that it will come down and bounce right off and there is plenty of room for it to get away. As soon as it gets away from there that box will keep flowing freely all the time. As that box flows freely all the time, it will more than adequately drain the area above. * * * Well, what happens: now it washes against that bank and it's probably—since I saw it—probably taking that bank down low enough that the water probably flows right across this man's property and seeks a way back in down below here and would in time actually change the whole stream bed right straight

through this property.' The matter could be corrected by constructing a curved concrete guide in the nature of a buffer, a guide wall or wing wall on the lower end of the culvert, which is practically at right angles to Burlington's right of way, to turn the water into the lower drainage ditch headed in the right direction. According to Col. des Islets, the railroad engineers did a good job on the culvert as far as they went but that they did not finish the job putting on a guide wall to turn the water. The guide wall could be added without going off of Burlington's property, and could be projected out 20 more feet from culvert and angled, 'so you aim it right down the stream.'

Prior to the time that the embankment was constructed and the ditches were altered, respondents had not suffered crop damage from floods. The first crop loss flooding after 1946 occurred in 1950 while Burlington was putting up the framework for the culvert, which resulted in the framework wood being scattered over the 18 acre tract below the embankment. The tracts involved consisted of bottom land, and respondents conceded that there had been some flooding from rains of two inches, but denied that there had been crop damage before the embankment and culvert were constructed.

Mr. Hawkins testified that beginning in 1950 respondents have repeatedly complained to Burlington about the flooding, and have requested it to remedy the situation but it has refused to make any attempt to remedy it 'which attitude and posture continues to this day.' According to him, since the embankment was completed, water backs up to 12 feet deep on the south side of the culvert and floods about 3 acres, then goes through the sloped culvert then on 25 to 30 feet where it hits the Anderson-Hawkins ditch. The water must then turn about 45 degrees (to the left) to go down that ditch, but it does not do so but arches over the ditch bank when 1½ inches of rain fall, which occurs quite a few times in the area where respondents

live. Since the culvert was installed, the 1½ inches of rain falling within a short time, causes the water to 'pond' above and to the south of the culvert after which it shoots out the lower end of the culvert with great velocity, carrying it over the drainage ditch onto respondents' 18 acre field below. The water then goes out across the field, up to 2 feet deep, turns toward its west end, and empties into a field north of where Mr. Hawkins had built a bridge across his ditch. Photographs taken in 1954, 1961, 1964 and 1966, show the ditch full of water and water flowing (in quantity) over the 18 acre tract. The 1966 flooding occurred after a rain of 11.2 inches, most of it falling within an hour. According to Mr. Hawkins, when his ditch became full of water it would not flow because the water therein had lost its velocity. 'The ditch fills up from just a pull of gravity on the fall from this, and it is stopped. There is no place for the water to go with the force it comes down that bridge, except right over the way you have directed it out over that field.' Mr. Hawkins testified further about the crop damages sustained by him as a result of rains in various years after the embankment and culvert were constructed, but no issue is here made as to damages except for the giving of certain instructions relating to punitive damages, and for the refusal of a withdrawal instruction as to any damage to lands north of the embankment. Thus, the matter of actual damages need not be discussed.

■ Appellant's first point, common to both appeals, is that the judgment should be reversed outright because its duty and liability is governed by § 389.660, RSMo 1969, V.A.M.S.; that the evidence is not sufficient to sustain a finding that the statute was violated. The point is further that the evidence is only that appellant complied with its duties and obligations imposed by the statute: It did construct and maintain a suitable opening and outlet through its right-of-way, did maintain suitable drains and ditches alongside the railroad and did

connect the opening with the existing drain, ditch and watercourse. It is thus apparent that appellant's position is that respondents had no common law remedies of trespass and nuisance because those remedies were supplanted by what appellant contends is an *exclusive* remedy under § 389.660. Respondents counter by saying the matter of exclusive remedy was not pleaded affirmatively by appellant and it cannot raise the issue for the first time on appeal. What has really happened is that appellant in its answer in the Clinton County case pleaded that in all counts respondents failed 'to state facts sufficient to constitute a cause of action against this defendant.' In the DeKalb County case, the same defense was raised by motion to dismiss and by answer to all counts of the petition. Then the matter was kept alive by motions made at the close of the cases and in after trial motions. Although the matter of exclusive statutory remedy could have been pleaded affirmatively, it was not necessary to do so. What appellant is in effect saying is that respondents failed to state claims for relief by not pleading the exclusive statutory remedy, and that the common law remedies no longer existed after the enactment of the statute. The issue thus descends to the determination of whether or not § 389.660 does in fact provide respondents with an exclusive remedy for their damages.

The pertinent part of § 389.660 is its subdivision 1: 'It shall be the duty of every corporation, company or person owning or operating any railroad or branch thereof in this state, and of any corporation, company or person constructing any railroad in this state, within three months after the completion of the same through any county in this state, to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such railroad, and suitable ditches and drains along each side of the roadbed of such railroad, to connect with ditches, drains and watercourses, so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad; and in case such corporation, company or person shall fail or neglect to construct and maintain such ditches or drains within the time limited in this chapter, any person owning land adjoining such railroad where such ditches or drains are necessary is hereby authorized, after giving thirty days' notice, in writing, to such owner or operator of said railroad, by service upon the nearest station agent or section foremen, to cause such ditches, drains, openings, culverts or trestles to be constructed and maintained, and such landowner may maintain an action against such corporation, company or person so failing to construct and maintain such ditches or drains, in any court of competent jurisdiction, and shall be entitled to recover all costs, expenses and damages incurred and accruing in the construction and maintenance of such ditches, drains, openings, culverts or trestles.'

The general rule as to exclusiveness of a statutory remedy is stated in 1 C.J.S. Actions, § 6c., p. 976: 'Where a statute prescribing a remedy does not create a new right or liability, but merely provides a new remedy for an independent right or liability already existing, the general rule is that the remedy thus given is not regarded as exclusive but as merely cumulative of other existing remedies, and does not take away a preexisting remedy, or, as more specifically stated, if a statute gives a new remedy in the affirmative, and contains no negative, express or implied, of the old remedy, the new remedy is merely cumulative; and in such a case, the party having the right may resort to either the preexisting or the new remedy, * * *. The general rule applies whether the preexisting right or liability is one previously enforceable at common law, or by virtue of some other statute or constitutional provision; and whether it was previously enforceable at law or in equity; * * *.' See also 1 Am.Jur.2d Actions,

§§ 76, 77, p. 604, et seq. The general rule has been followed in Missouri in various cases: Hickman v. City of Kansas, 120 Mo. 110, 25 S.W. 225, 226 (1894), where plaintiff's judgment for just compensation for taking his property for public use was affirmed, where the suit was brought under the constitutional provision, the court rejecting defendant's contention that a statute gave the exclusive remedy; Bruecker v. City of St. Louis, 246 S.W. 889, 892 [2] (Mo.1922), where the city began changing the grade of a street without first following a statute requiring that damages be ascertained and paid before work began, and thus the property owner had his independent remedy for ascertainment of damages if the city elected to begin its improvement before that step was taken; Eaton v. Mississippi River & B. T. Ry. Co., 201 Mo.App. 194, 209 S.W. 974 (1919), holding that the statutory action against a railroad for loss of stock is not exclusive of the common law action for negligence; and Lajoie v. Central West Casualty Co. of Detroit, Mich. [228 Mo. App. 701], 71 S.W.2d 803 (Mo.App.1934), where defendant unsuccessfully contended that a creditor's bill or an equitable garnishment being 'distinct and well-defined common law procedure' were supplanted by statutory proceedings in equity. The court said (71 S.W.2d 813), 'The rule is that, if a statute gives a remedy in the affirmative without containing any expressed or implied negative for a matter which was actionable at common law or by statute, this does not take away the common-law remedy or the statutory, but the party may still pursue the old remedy at common law or the old statutory remedy as well as the new remedy by the new statute. In such cases, the new statutory remedy will be regarded as permissive.' See also Everett v. County of Clinton, 282 S.W.2d 30 (Mo. 1955), holding that the common law remedy of injunction was available to tax payers to prevent illegal expenditures of public funds although there was a statute providing such a remedy.

In Corrington v. Kalicak, 319 S. W.2d 888, 892 [4–7] (Mo.App.1959), a flooding case resulting from the obstruction of the flow of water in a natural watercourse, the court observed, 'The facts in this case suggest several theories of liability for the damages plaintiffs claim to have suffered: (a) an action based upon negligence (the theory most often relied upon in flooding cases); (b) an action based upon nuisance; (c) an action invoking Article I, § 26, of the Missouri Constitution of 1945, V.A.M.S., which provides that private property shall not be damaged for public use without just compensation; (d) an action based upon trespass.' It is clear that the common law remedies were available before the enactment of § 389.660, all pertaining to the liability of railroads for improperly constructing openings across and through rights of way. This statute does not create a new right or liability or a new remedy which were not existing at common law as would make it exclusive under such cases as Gales v. Weldon, 282 S.W.2d 522, 529 (Mo.1955), and State of California v. St. Louis Union Trust Co., 260 S.W.2d 821 (Mo.App.1953). Smithpeter v. Wabash R. Co. [360 Mo. 835], 231 S.W.2d 135 (Mo. banc 1950), does not say that the decisions of Kenner [Keener] v. Sharp [341 Mo. 1192], 111 S.W.2d 118 (Mo.1937), and Vollrath v. Wabash R. Co., 65 F.Supp. 766 (D.C.1946), were erroneous in submitting them on a common law theory as stated by appellant. Kenner did not involve a railroad, and Vollrath was tried upon the theory of a violation of the statute. From all the foregoing it appears definitely that the respondents had their right of election as between the common law remedies and the cumulative, permissive, and alternative remedy under § 389.-660, and appellant's contention to the contrary is overruled.

Because of the proper application of the common law remedies of trespass and nuisance, the words of the statute requiring the railroad to construct and maintain *suitable* openings through the right-

of-way, and *suitable* ditches and drains to connect with ditches, drains and water-courses, so as to afford sufficient outlet to drain and carry off the water do not control as to the proof required of respondents to make submissible cases. Respondents' evidence, regarded in its most favorable light, shows that appellant (or its predecessor) changed the natural drainage courses of both the Anderson and the north-south ditches into one channel on the south side of the embankment, thence through the culvert where the natural drainage was again changed to cause water to make a 90 degree left turn to enter the Hawkins natural drainage ditch. It is at this point that respondents' theory, supported by the evidence, becomes applicable. In times of rainfall of more than 1½ inches, the water flows through the culvert, then piles, or 'boils', upwards at the 90 degree turn instead of flowing down the Hawkins ditch, forming a water dam. As the water gets higher, not only does it rush over respondents' lower 18 acres, but also since the flow of water lessens through the culvert it backs up over about 3 acres on the south side to as much as 12 feet deep. The gist of the basis for the trespass action and the nuisance action is an improperly constructed culvert to carry the water into the Hawkins ditch. It is plain that appellant could have remedied the situation by the construction of a 45 degree wing wall to divert the water to the left. Instead, what has happened is that the surface waters have been *impounded* to the south and then *diverted* in great quantities onto respondents' land, to their damage. These facts give rise to the rights of recovery under either the trespass theory or the nuisance theory (Kalicak, supra) under the exception or modification of the common enemy doctrine as to surface waters in this state. That is that a dominant proprietor, in his fight against surface water, may not collect it or impound it by artificial means and then discharge or divert it in increased amounts or concentrated flow upon the servient estate otherwise than through natural drainways. Tucker v. Hagan, 300 S.

W. 301, 303[5] (Mo.App.1927); Haferkamp v. City of Rock Hill, 316 S.W.2d 620, 625 (Mo.1958); and cases cited; Reutner v. Vouga, 367 S.W.2d 34, 41 (Mo.App. 1963); Peters v. Shull, 379 S.W.2d 837, 840 (Mo.App.1964), and see 'The law of Surface Water in Missouri', 24 Mo.L.Rev. 281 (June 1959). Under the facts and the law, respondents made submissible cases for the jury upon both common law theories.

Argument is made by appellant that respondents' position that a wing wall could have been constructed to turn the water down the natural Hawkins ditch is untenable because appellant had no right to go beyond its own right of way for that purpose. It would perhaps suffice to say that the evidence conflicted (in the trespass case) as to whether it was in fact necessary for appellant to have gone beyond its own property for this purpose, and therefore, the matter was for the jury to determine. However, in Cottier v. Chicago, B. & Q. R. Co., 33 S.W.2d 173, 177[2, 3] (Mo.App.1930), it was noted that if the railroad lacked sufficient right of way to build a ditch conduit it was empowered to obtain all the right of way necessary for that purpose, as applicable also to the nuisance case. Along with the general condemnation statutes, Chapter 523, RSMo1969, V.A.M.S., see also §§ 388.-210(3) and 388.370; Coates & Hopkins Realty Co. v. Kansas City T. Ry. Co., [328 Mo. 1118], 43 S.W.2d 817, 822[9] (Mo. banc 1931); and Norfolk and Western Railway Company v. Greening, 458 S.W.2d 268, 270[2] (Mo.1970). So even if a proper installation of the wing wall would have required appellant to go upon the property of another, it was empowered by law to do so.

In the DeKalb County trespass case, appellant here attacks Instruction No. 3, which is:

'Your verdict must be for plaintiffs, on each of the three counts if you believe:
First, the defendant in constructing and

maintaining its roadbed diverted the Anderson ditch and the north-south ditch mentioned in evidence, and

Second, the roadbed collected the water flowing in the Anderson ditch and the north-south ditch, and

Third, the water so collected flooded plaintiffs' land located on the south side of the roadbed, and

Fourth, the water so collected was diverted and discharged upon and flooded plaintiffs' land located to the north of the roadbed, and

Fifth, as a direct result thereof the plaintiffs sustained damages.

Not MAI

Submitted by Plaintiffs.'

 It is first said that the instruction contained none of the elements which would set forth a violation of § 389.660, supra. It was not necessary to do so on the above ruling that respondents had their election as between common law trespass and a statutory basis for the action. It is next said (in the point only, without development in argument) that the instruction does not follow the common law pertaining to the right of servient landowners to recover for alleged flood loss. The gist of the action for trespass is a disturbance of possession. Poole v. Roloff, 361 S.W.2d 340 (Mo.App.1962). In Kalicak, supra, it was held that flooding damages can be recovered in trespass. Although there is no MAI for trespass, Instruction No. 3 fairly submits respondents' theory that in constructing its roadbed, appellant caused the water to collect above it, and thereafter it was diverted and discharged upon the land below the roadbed. The words used follow the spirit and purpose of MAI, being brief, impartial and free from argument, and the instruction is supported by the evidence. In a trespass case, negligence is not a necessary element and need not be submitted

as contended. Kalicak, supra; Bell v. Union Electric Company of Missouri, 367 S. W.2d 812, 822[10–12] (Mo.App.1963). Although not raised in its motion for new trial (which therefore need not be noticed), appellant claims Instruction No. 3 does not require a finding of causation. The claim is without foundation because the fifth clause does require the enumerated ultimate facts to directly result in respondents' damages. Skaggs v. City of Cape Girardeau, 472 S.W.2d 870 (Mo. App. 1971), is distinguishable because there a reversal was ordered because of an erroneous theory which the facts did not support, in that the city did not change the natural flow of water by diverting it from another watershed, or by channelling it away from its natural drainage. All that was shown was that the city increased the rate of flow from a previous area serviced by a less efficient drainage system, and there was no evidence that the city changed the topography of the ground or any of the drainways or channels which led away from it. Instruction 3, in its submitted facts, does not impose absolute liability, and appellant's objections to it are ruled against it.

Appellant says its withdrawal Instruction B, withdrawing the issue of damages to the 18 acres north of the right-of-way, should not have been refused. It argues that the evidence shows that it complied with the 'open-up' statute, § 389.660. As the above recounted testimony of Col. des Islets reveals, appellant did not go far enough in constructing its culvert, and omitted to construct a wing wall to divert water down the natural channel, thus ultimately causing the flooding which resulted in respondents' substantial damages. The statute is inapplicable, as noted, and the court did not err in refusing this withdrawal instruction.

Appellant in the Clinton County nuisance case also makes attacks on the verdict directing instructions applicable to the four counts of the petition. The instructions

are identical, and only the first (2A) need be set forth:

'Your verdict must be for the plaintiffs on Count I of their petition if you believe:

First, Defendant diverted the waters of the Anderson ditch and the north-south ditch and combined them in a stream funneled through the culvert or box in its roadbed, and

Second, during the year 1962 in times of rains of one and one-half (1½) inches or more in a relatively short time said culvert caused the waters to pond and stand at the entrance to said culvert and to be discharged out of the other end over the drainage ditch into, over and across plaintiff's field, and

Third, such floodings created and left pools of stagnant water, hindered plaintiffs in their farm operations, drowned out and destroyed their crops and substantially impaired plaintiffs' use and enjoyment of their farm and home, and

Fourth, such use by defendant of its property over plaintiffs' repeated protests was unreasonable.

MAI 22.06 modified.'

Appellant again says that this instruction ignores § 389.660, but that has been above ruled as not applicable to a common law trespass case, and the same ruling here applies as to this common law nuisance case. The same ruling, supra, also applies with respect to imposing upon appellant absolute liability for flooding, because under the facts, respondents had their alternative remedy for nuisance (Kalicak, supra).

■■■■ Instruction No. 2A (and the other verdict directing instructions) follows MAI 22.06, and is modified only to hypothesize the ultimate facts of this nuisance case. There was evidence to support each submission of the nuisance instruction: The creation of a culvert improperly constructed (again without an adequate wing wall

to divert the watercourse down the natural Hawkins channel); the ponding of water at the entrance to the culvert, and the discharge of water at its other end over and across respondents' land. The floodings created and left pools of stagnant water (not stated above, but testified to by Mr. Hawkins), hindered farm operations and destroyed crops which substantially impaired respondents' use of their property.

■■■■ In nuisance cases, as in trespass cases, there is no requirement that *negligence* be the basis of liability. Vaughn v. Missouri Power & Light Co., 89 S.W.2d 699, 702 [1–12] (Mo.App.1935); Blydenburgh v. Amelung, 309 S.W.2d 150, 152 [1–3] (Mo.App.1958). Nor does MAI now require a finding of causation (which appellant says should have been done, but which contention was not set forth in its motion for new trial), nor of actual damages (because as the Committee's Comments to MAI 22.06 recite, it is not an essential element to plaintiffs' case—plaintiffs may be entitled to at least nominal damages).

On the issue of punitive damages, the court gave four identical instructions relating to the verdict-directing instructions, as to the four counts. Instruction No. 6A, being the same as the others, is:

'If you find the issues in favor of the plaintiffs on Count I, and if you believe the conduct of the defendant as submitted in Instruction No. 2A was wilful, wanton, or malicious, then in addition to any damages to which you find plaintiffs entitled under Instruction No. 5, you may award the plaintiffs an additional amount as punitive damages in such sum as you believe will serve to punish the defendant and to deter it and others from like conduct.' [This is the form of MAI 10.01.]

■■■■ In repetition, appellant argues that this instruction was not warranted because, it says, the evidence showed it complied with § 389.660. Noncompliance with

the statute, even if it were the basis for these actions, is above mentioned as not supplanting the common law remedies. It next says there is no evidence that any act of appellant 'was intentionally done without regard to the rights of others and in full realization of the probable results thereof.' The evidence is ample to support a finding of a continuing intentional nuisance after the first flooding. In 1950, Mr. Hawkins notified appellant, and made thereafter numerous complaints. Cf. Bower v. Hog Builders, Inc., 461 S.W.2d 784, 799 [7] (Mo.1970). See the discussion of legal malice in Beggs v. Universal C.I.T. Credit Corporation, 409 S.W.2d 719 (Mo. 1966), here present within the definition of that term, in that appellant, over the four years in question, in the face of early notice and numerous complaints of the flooding conditions, failed and refused to remedy the situation. It is not necessary extensively and further to review the many cases relating to liability for the maintenance of a nuisance. It is not true as appellant states in its brief, 'All the evidence is that defendant's civil engineer planned and built the culvert properly.' Col. des Islets testified as to the omission of the necessary wing wall. It is not necessary to decide whether a defense of justification and reliance upon appellant's own construction engineer in the construction of the culvert was required to be affirmatively pleaded. Contrary testimony to that of Col. des Islets merely created an issue for the jury, which has resolved the matter of appellant's maintenance of a nuisance to the detriment of respondents' peaceable enjoyment of their property against appellant. That resolution is supported by the entire record."

After giving consideration to the oral arguments made in this court, the supplemental briefs submitted and the original briefs filed in the Court of Appeals, we believe that the opinion of that court, herein quoted verbatim, properly disposed of all issues on appeal. The parties, in very comprehensive and exhaustive briefs, have cited most every available case to sustain their respective positions; but, necessarily, they recognize that the authoritative force of each must be measured by the facts upon which it was ruled. Nothing could be gained by further discussion of the precedents mentioned in the opinion of the Court of Appeals, and we do note that appellant has not suggested that any controlling decision has been overlooked.

We do observe, nevertheless, that appellant has based its argument on the assumption that it had complied fully with Section 389.660, RSMo 1969, V.A.M.S. The record does not sustain such a premise. The statutes required that the water going through the "opening[s]" again "connect with ditches, drains and watercourses" on the lower side of the roadbed. Regardless of the theory of recovery, the case turned on a finding that the culvert (opening) had been improperly constructed because it did not return the water to its original channel.

The judgments in both cases are affirmed.

SEILER, Acting C. J., and MORGAN, BARDGETT and HENLEY, JJ., concur.

FINCH, J., dissents in separate dissenting opinion filed.

STOCKARD and HOUSER, Special Judges, dissent and concur in separate dissenting opinion of FINCH, J.

DONNELLY, C. J., and HOLMAN, J., not sitting.

FINCH, Judge (dissenting).

I respectfully dissent from the principal opinion herein.

In the case of White v. Wabash R. R., 240 Mo.App. 344, 207 S.W.2d 505 (1947), Judge Cave, writing for the Kansas City Court of Appeals, reviewed the subject of

the obligations imposed upon railroad companies under § 5222 RSMo 1939, the predecessor statute of § 389.660 RSMo 1969, V.A.M.S. After discussing various cases which had considered the law of Missouri with respect with surface water, the court said, 207 S.W.2d l.c. 509:

"But plaintiffs contend that, even under the common-law doctrine, the dominant proprietor, in his fight against surface water, cannot collect the same in a large body, conduct it *by artificial means, as by a ditch,* and discharge it upon the servient estate in an increased volume. That doctrine is thoroughly established in this state *when certain facts exist.* Tucker v. Hagan, Mo.App., 300 S.W. 301, 303; Kiger v. Sanko, Mo.App., 1 S.W.2d 218; Farrar v. Shuss, 221 Mo.App. 472, 475, 282 S.W. 512, and many other cases cited in those opinions. But when those cases are analyzed they do not involve a consideration of Sec. 5222, RSMo 1939, Mo.R.S.A., and are not decided upon the rights and obligations which that section *gives* and *imposes* upon a *railroad company.* Those, and similar cases, are discussing and deciding a situation where the owner of the dominant estate (not a railroad company) collects surface water in an artificial ditch or pond and discharges it upon the servient estate at a point where there is not a *natural watercourse.* In other words, the dominant estate does not permit the surface water to follow the natural contour of the land and flow onto the servient estate in a multitude of places, but rather collects the same into a concentrated area and discharges it in a large volume upon the servient estate at a point where there is no natural drain on the servient estate to carry it away.

"However, Sec. 5222, supra, requires the company, within three months after the completion of the construction of a railroad in any county in the state, 'to cause to be constructed and maintained suitable openings across and through the

right of way and roadbed of such railroad, and *suitable ditches and drains* along each side of the roadbed of such railroad, to connect with *ditches, drains or water courses,* so as to afford sufficient outlet to drain and carry off the water, *including surface water,* along such railroad whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad; * * *.' (Italics supplied.) Thus the railroad is required by statute to construct and maintain suitable *ditches* and *drains* along its tracts or right-of-way *for the very purpose of collecting surface water* and *draining it into other ditches, drains or watercourses* where it will be carried away. This is an obligation not required of other owners of a dominant estate."

Shortly thereafter, this court decided the leading case of Smithpeter v. Wabash R. R., 360 Mo. 835, 231 S.W.2d 135 (Mo. banc 1950). Plaintiff had obtained a verdict for damages resulting from floodwaters produced by the impoundment by the railroad of waters from Wakenda Creek including surface water. Recovery was made on the basis that the opening constructed by the railroad in its embankment pursuant to § 5222 RSMo 1939 was too small, causing the waters to back up and destroy plaintiff's crops. In deciding that appeal, this court considered at length the meaning and effect of § 5222 and the rights and responsibilities of the railroad thereunder, both with respect to water in natural watercourses and surface water. Beginning at l.c. 140, of 231 S.W.2d, the court said:

"The statute, Sec. 5222, made it the defendant's duty 'to cause to be constructed and maintained suitable openings across and through the right of way and roadbed of such railroad * * * to connect with ditches, drains or watercourses, so as to afford sufficient outlet to drain and carry off the water, including surface water, along such railroad whenever the draining of such water has been obstructed or rendered necessary by

the construction of such railroad,' etc. The defendant was under the statutory duty to maintain *suitable* openings through its right of way (to connect with the Wakenda watercourse south of its track) *to afford sufficient outlet for the water, including surface water,* because the draining and escape of that water is naturally obstructed by the railroad embankment unless the railroad permits it to pass through to the south side. No railroad may dam up a flowing watercourse. No railroad may back up the water flowing in a natural watercourse. The opening under its bridge must be sufficient to permit all water coming down the watercourse to flow through the railroad embankment, even in flood times. Jones v. Chicago, B. & Q. R. Co., 343 Mo. 1104, 125 S.W.2d 5; Goll v. Chicago & A. R. R. Co., 271 Mo. 655, 197 S.W. 244; Brown v. St. Louis & S. F. R. Co., 212 Mo.App. 541, 248 S.W. 12. Under this statute a railroad must have an opening through its embankment sufficient to let through the water, including surface water, which reaches its embankment. When the water reaches the railroad embankment it must either be permitted by the railroad to get through the embankment or it will (as it did in this case) flood the land above."

The railroad contended that plaintiff had not shown that there were sufficient ditches, drains, or watercourses below the railroad embankment sufficient to carry off the water coming through defendant's embankment. For this reason, said the railroad, plaintiff was not entitled to recover damages on the basis that the opening was not sufficient and had caused impoundment of the water above the embankment. This court overruled that contention, saying l. c. 141:

"We do not agree that a railroad's duty is so limited under that statute. Analysis of the statute discloses nothing therein which limits the railroad's duty to passing through its embankment only such water as can be carried off below.

In Sec. 5222, we find neither words nor context which warrants any such construction. The statutory duty is that the railroad must construct and maintain 'suitable openings' through its embankment, to connect with watercourses, 'so as to afford sufficient *outlet*' (through its embankment) i. e., to permit all water (including flood water) to get through its embankment to the lower side, 'whenever the draining of such water has been obstructed or rendered necessary by the construction of such railroad.' Jones v. Chicago, B. & Q. R. Co., supra. There is not one word in the statute limiting the water the railroad must let through its embankment to such water as can be carried off within the banks of the drain, ditch or watercourse below the railroad. Nor is there anything in the statute intimating the railroad's duty is discharged if the water above the embankment and required to be let through cannot be carried off within the banks of the existing 'ditch, drain or watercourse.' The statute does not require the watercourse below the bridge be 'sufficient' to carry away water drained through the embankment.

"It is required that there be a ditch, drain or watercourse into which the opening in the embankment allows the water to flow. * * * But there is no statutory requirement as to the *sufficiency*, or the *size*, or the *water carrying capacity* of the connecting ditch, drain or watercourse extending below the embankment."

The court then proceeded to discuss and overrule earlier Court of Appeals opinions which had held that the ditch, drain or watercourse below the embankment must be amply sufficient to carry the water let through the embankment.

The court summed up as follows, l. c. 143:

"To judicially declare that a railroad is required under this statute to pass through its embankment only such water

as will not overflow the ditch, drain or watercourse running from the downstream side of its embankment, in effect, is to declare that a railroad may itself determine the extent of its duty under this statute. That would nullify the statute. Nor can the law be written that a railroad must be able to correctly gauge, under any and all conditions and at all places, or under any circumstances, the adequacy, sufficiency or water carrying capacity of a lower ditch, drain or watercourse, and thus at its peril let only so much (and no more) water through its embankment. Such a construction would place upon the railroad an even greater burden than the instant statute, and, likewise, would circumvent the plain purpose of the statute's enactment. The legislative intent was that, under the circumstances stated in the statute, a railroad embankment shall not serve as an artificial dam to back up water upon a dominant owner to the damage of the latter."

While the court's discussion focused particularly on the fact that the railroad's obligation to allow all water to pass through the embankment was contingent only on the existence of a ditch, drain or watercourse below the outlet and not upon the size or capacity of such ditch, drain or watercourse, it is clear that the court in Smithpeter and in White was saying that the obligations and rights of railroads are governed by the statute in question. The opinion states that the statute may not be construed or applied so as to impose on railroads greater obligations than those specified in the statute. It follows that the rights and obligations of appellant herein with respect to both impoundment and release of water diverted from watercourses (including surface water) are those spelled out in § 389.660 and that said statute also governs and limits the rights that plaintiffs as ones affected by alleged failure of appellant to comply with the requirements of § 389.660 may assert. The statute rather than the common law fixes the rights and obligations of both the railroad and the

property owners in those situations such as this where the statute is applicable.

Appellant herein contends that the evidence in these cases shows full compliance by it with the requirements of § 389.660 and that verdicts in its favor should have been directed in both cases. As indicated above, I agree with appellant's contention that § 389.660 is a substantive statute which fixes and limits the railroad's rights and obligations, but I do not agree that defendant is entitled to a directed verdict in these cases. Col. Des Islets, the expert witness who testified on behalf of plaintiffs, stated that the box culvert constructed by defendant was properly located and was adequate in size to handle the water from the Hawkins-Anderson ditch and the tributary ditch (including surface water) but he further testified that the culvert was not properly connected to the ditch below the embankment. He pointed out that instead of the culvert being constructed in direct alignment with the ditch below, it was connected at a 45 degree angle with nothing to direct or channel the water from the culvert into the existing ditch. The result, according to Col. Des Islets, was the creation of an artificial water dam at that point which impeded the flow of the water, causing some impoundment above and resulting in water overflowing below onto the plaintiffs' land instead of flowing into the ditch. Col. Des Islets was of the opinion that a short wing wall or guide wall in connection with the culvert would channel the water into the ditch and prevent the formation of the artificial water dam with the resultant impoundment and overflow.

When § 389.660 provides that the opening in the embankment shall connect with ditches, drains or watercourses in order to drain off the water (including surface water), it means that the railroad shall *properly* connect therewith, i. e., in a manner which will permit the unimpeded flow of water through the embankment into the ditches, drains or watercourses below. Construction in such a manner as to create

an artificial water dam rather than an un-impeded flow is not such a connection. Thus, the testimony of Col. Des Islets, if believed by the jury, was sufficient to support a verdict for plaintiffs because it established appellant's failure to properly connect the culvert to the ditch below. Such failure would constitute noncompliance with the requirements of § 389.660.

The principal opinion recognizes that, as appellant contends, plaintiffs' verdict-directing instructions do ignore § 389.660. For example, it recognizes that Instruction 3 does not require a finding of any of the elements which would constitute a violation of § 389.660 but justifies that fact on the basis that such finding is unnecessary when the landowner elects to sue for trespass.[1] The net effect of this ruling in the principal opinion is that compliance with § 389.660 is no defense to a railroad if any land upstream or downstream is flooded and that a plaintiff landowner may ignore the statute and sue just as though it did not exist. In my view such a position is untenable. Subsections 1 and 3 of § 389.660 specifically provide for actions against the railroad for damages resulting either from failure on the part of the company to construct and maintain in accordance with the statute or in any other respect failing to comply with provisions of the statute. It is obvious that the General Assembly intended that if the railroad fully and completely complied with the obligations mandatorily imposed by the statute, recovery for diversion of the water *should not* be allowed. It was not intended to impose strict liability irrespective of whether the railroad complied with its obligations. The statute contemplates only recovery for breach of statutory obligations resulting in damage.

As noted above, plaintiffs submitted these cases to the jury on the basis of nuisance and trespass rather than on the basis of breach of the statutory obligations. Even if we assume the correctness of plaintiffs' contention that they may sue in this manner rather than by employing the rights of action granted in subsections 1 or 3 of § 389.660, a question I do not reach or decide, plaintiffs' instructions in any event are erroneous because they would permit recovery from the railroad even though it did precisely and only what § 389.660 requires it to do. Regardless of the label to be attached to a landowner's suit against the railroad, the verdict-directing instruction must submit the issue of whether the defendant has breached its obligations under § 389.660.

There was also an issue as to whether the court erred in submitting the issue of punitive damages in the Clinton County case and whether the instructions as given were correct. In view of my conclusion that plaintiffs' verdict-directing instructions in both cases are erroneous, I do not reach the issues with respect to punitive damages.

I would reverse and remand because of error in plaintiffs' verdict-directing instructions.

---

1. The principal opinion makes the same ruling with respect to a comparable deficiency in instruction 2A (also 2B, 2C and 2D), in the nuisance case, holding that such finding is not necessary when the landowner elects to sue based on a claim of nuisance. However, somewhat inconsistently, the principal opinion goes on to state as follows: "There was evidence to support each submission of the nuisance instruction: The creation of a culvert improperly constructed (again without an adequate wing wall to divert the watercourse down the natural Hawkins channel); * * *." This statement seems to assume that Instruction 2A submitted to the jury this issue of alleged improper construction by not including a wing wall. Such is not the case. An examination of Instruction 2A discloses that such issue was not submitted to the jury. Hence, in part, the principal opinion justifies Instruction 2A on a false premise.